## ORDER OF THE UNITED COMMERCIAL TRAVELERS OF AMERICA v. NICHOLSON et al.

(Circuit Court of Appeals, Second Circuit. June 16, 1925.)

No. 152.

1. **Insurance ⊛⇒718—Benefit certificate, constitution, by-laws, articles of incorporation, and member's application held contract.**

Benefit certificate in fraternal corporation, its constitution, by-laws, articles of incorporation, and member's application for insurance constituted contract between member and corporation by which rights of parties were determined.

2. **Insurance ⊛⇒817(3)—Burden on plaintiffs to prove by preponderance of evidence that death resulted solely from accident not contributed to by disease.**

Under fraternal benefit contract, insuring against death by accidental means independent of other causes, and not contributed to by disease, burden was on plaintiffs to prove by preponderance of evidence that member's death resulted solely from accident, not contributed to by disease in any degree.

3. **Insurance ⊛⇒787—Instruction that arteriosclerosis was not disease within fraternal certificate held error.**

In action on benefit certificate insuring against death caused solely by accidental means

not contributed to by disease, instruction that arteriosclerosis was not a disease was reversible error.

**4. Evidence ☞14—Common knowledge that arteriosclerosis is frequent cause of death, and that one in advanced state thereof is dangerously diseased.**

It is common knowledge, of which court takes judicial notice, that arteriosclerosis is frequent cause of death, and that one in advanced state thereof is very dangerously diseased.

**5. Trial ☞182—Object of instructions is to direct jury's attention to legal principles applicable to facts.**

Object of instructions is to direct jury's attention to legal principles applicable to facts, in such a manner that jury may not be misled.

**6. Trial ☞234(2)—Extent of review of evidence by court depends on circumstances of particular case.**

Extent to which court should review and comment on evidence depends greatly on circumstances of particular case.

**7. Trial ☞210(1)—Court should charge that expert evidence has no probative force, if facts assumed in hypothetical question are not true.**

Where reliance is placed on expert evidence, court should instruct that expert's opinion has no probative force, if jury fails to find that facts assumed in hypothetical question were true.

**8. Trial ☞255(1)—Mere failure to instruct in absence of request is not ordinarily error.**

Mere failure to instruct in absence of request is not ordinarily error.

**9. Insurance ☞819(4)—Proof held not to sustain burden on beneficiaries of proving that death was not contributed to by disease.**

Proof that fall caused shock which caused lobular pneumonia, and that later caused death, *held* not to sustain burden on beneficiaries of proving that death of member of fraternal benefit corporation was caused by accident not contributed to by disease.

In Error to the District Court of the United States for the Northern District of New York.

Action by Katherine Ostrander Nicholson and others against the Order of the United Commercial Travelers of America. Judgment for plaintiffs, and defendant brings error. Reversed.

The action was commenced in the Supreme Court of Cayuga county in the state of New York, and on motion of defendant was removed to the District Court of the United States.

The defendant is a corporation organized under the General Laws of the state of Ohio. It has its principal office in the city of Colum-

bus in that state. It is organized as a fraternal beneficial order for the purpose of issuing certificates of membership of insurance against accidents, and death caused by accidental means, to the persons holding a certificate of membership.

The plaintiffs are the daughters of Lewis Ostrander, deceased, and he was at the time of his death a member of the defendant corporation. They have brought this action to recover on an insurance certificate issued by the defendant to their father, and upon which at the time of his death all assessments had been paid.

It appears that Lewis Ostrander died on December 23, 1922, and the complaint alleged that his death was the direct and proximate result of and caused solely by external, violent, and accidental means, and was not the result or caused by any of the exemptions set forth in the certificate of insurance.

The jury returned a verdict in favor of the plaintiffs in the sum of $4,330, and judgment for that amount was entered on January 26, 1924. A motion to set aside the verdict was made and denied. Thereupon a writ of error was sued out.

Murphy, Foertch & Alvord, of Syracuse, N. Y. (John A. Millener, of Columbus, Ohio, of counsel), for plaintiff in error.

Pellet, Fay & Rubin, of New York City (William W. Pellet, of New York City, of counsel), for defendants in error.

Before ROGERS, HOUGH, and HAND, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). This action was brought to recover on an insurance certificate issued by the Order of the United Commercial Travelers of America, defendant herein, to Lewis Ostrander, wherein it insured him, among other things, against loss of life as the direct and proximate result of, and caused solely and exclusively by, external, violent, and accidental means, provided such loss should occur within 180 days after the accident which caused it. The insurance was for the amount of $6,300. The certificate provided that $5,000 of this sum should be paid within 90 days from the receipt by the Supreme Executive Committee of satisfactory and final proof of death, and the remaining $1,300 was to be paid in weekly installments of $25 each, beginning 90 days from the receipt of such final proof.

Lewis Ostrander, as a member of the defendant organization at the time of his death, had paid to it all dues and assessments, and

had performed all the terms and conditions of the certificate which was issued to him, and each and every obligation and duty as a member of the order which he was bound to perform he had fulfilled.

The insured died on December 23, 1922, and this action was commenced originally in the Supreme Court of Cayuga county in the state of New York, in June, 1923, and was then removed upon defendant's motion into the District Court of the United States. The trial began in that court on December 10, 1923, and a verdict was rendered on December 14, 1923, in favor of the plaintiffs in the sum of $4,330.

While the certificate insured Ostrander in the sum of $6,300, and the complaint as filed demanded that amount, it appeared that he left three children surviving him; two daughters, who were the plaintiffs in this action, and a son, who was an incompetent and not a party. At the close of the trial, and before the jury was charged, the counsel for the defendant suggested that, if the jury should find that the plaintiffs were entitled to recover, they were entitled to recover only two-thirds of $6,300, the amount for which the action was brought. And counsel for the plaintiffs then stated that he agreed that such was the case. The court instructed the jury accordingly, and charged that "your verdict will be either $4,330 for the plaintiffs, or no cause of action."

Lewis Ostrander died on December 23, 1922. If he had lived until the following March 6th he would have been 70 years of age. At the time of the accident complained of, he was living at the Salvation Army Hotel in Auburn, New York. He came into the hallway of the hotel from the street about 9 o'clock on the evening of December 14, 1922. Whether he fell before he started to ascend the stairs which led up to the office on the second floor, or fell before he started up the stairway, is not clearly established by the evidence. The fact is that he fell; that his fall was heard in the office; that he was picked up and carried to his room and the next day removed to the City Hospital, where he died on December 23, 1922. The testimony shows that no bones were broken in his fall. There were some abrasions on the left wrist and an abrasion on his right elbow. The physician who attended him stated that his death resulted from lobular pneumonia. He was asked the following question:

"Q. The question is, Can you say with reasonable certainty, based upon your experience, whether or not the pneumonia of which he died was a natural and proximate result of the fall he sustained on the 14th day of December, 1922?"

This was objected to, and the objection overruled, and the witness answered, "Yes." Then he was asked:

"Q. Now, will you please state whether or not the pneumonia which you found and which existed in Mr. Ostrander on December 21 or 22, 1922, was a natural and proximate result of the condition in which you found him on the 14th day of December, 1922?"

And over objection he was allowed to answer:

"Q. The court says you may answer the question, Doctor? A. It was, yes.

"Q. It was the natural and proximate result? A. Yes, sir."

The only other medical witness called by the plaintiffs was a lecturer on pathology at Bellevue Medical College at New York City. He had no personal knowledge of the case, and had never seen the deceased. His testimony was given as an expert. A long hypothetical question was put to him; the concluding portion of which was as follows:

"Q. Assuming that a man that is 69 years of age, in ordinary health, on the 14th day of December fell down several steps in a stairway, causing an abrasion of the elbows and forearms; * * * that he showed no evidence of arteriosclerosis in the palpable arteries beyond that which is usual to a man of his age; that during the night of December 21st he showed evidences of having pneumonia; that he died on the 23d day of December—can you, with reasonable certainty, based upon your experience, say whether or not the fall that he sustained was a competent producing cause of the pneumonia which developed on or about the 21st of December?"

He was allowed to state over objection that he could, and he was then asked and allowed over objection to answer:

"A. It is a very likely and probable result of the injuries. It is what we look for and watch for in such cases."

He stated that the older a man gets, and the more he suffers from hardening of the arteries and various other things, the less his resistance becomes to disease and the accumulation of these germs. And he further said that all persons have pneumonia germs in their systems all the time, generally speaking, and it does not require, in itself, any outside, external, or violent means to start up these in cases of lobar pneumonia but not usual in lobular.

One of the plaintiffs, Ostrander's daughter, testified that her father came to live with

her in New York City some two years before his death, and that she had never noticed anything unusual in his method of walking. She never observed him when he had any dizzy spells, nor saw him fall. She said:

"I have noticed no change in his manner or method of walking during those two years that he lived with us, or the latter part of those two years, and the time that I knew him as a girl. That is the one thing I noticed."

The husband of the above witness also testified:

"I did not observe anything particular about his physical condition while he was living with us. He had a peculiar walk; rather a deliberate, easy walk, not a rapid walk. He had that manner of walk as long as I knew him, but I did not observe any signs of a particular change during the last few years."

A New York City physician, a graduate of Columbia College and of the College of Physicians and Surgeons of New York, who had studied abroad, and who was called by the defendant, testified that he was present at the autopsy performed on Ostrander's body. He positively denied that the man had had lobular pneumonia, and stated that he had lobar pneumonia, which he said was a form of pneumonia that old people are peculiarly affected by. It is a germ disease, but not one which could have been produced by germs being brought into the body from any abrasions on any exterior part of the body. "It could not be caused, accelerated, or affected in any way whatsoever by exterior abrasions." He testified that Ostrander "was in an advanced state of arteriosclerosis, on the 14th day of December, 1922. That was an old condition, a condition of long duration of years. I would put that down at 10 years about." He was asked, taking into consideration the physical condition disclosed by the autopsy, to state what in his opinion was the probable cause of his fall, if he had a fall on December 14, 1922, as was assumed. His answer was:

"I think it was accounted for by his arteriosclerosis and also by his pneumonia, either one or both.

"Q. And what condition in that man's body or brain did these diseases which you have indicated that he was suffering from on the 14th day of December, 1922, cause? A. Oh, I think that the arteriosclerosis caused vertigo, a dizziness, which could or might cause him to fall. The poisoning of the pneumonia, which was also present, might have caused a weakness from which he fell.

He added:

"The cause of this man's death, from my examination, was lobar pneumonia, complicated by arteriosclerosis, fatty degeneration of the kidney, and a chronic endocarditis, or heart disease."

The defendant also called the medical examiner of the city of New York, a physician by profession, and who conducted the autopsy on Ostrander's body. He had made some 2,200 autopsies. Testifying as to what the autopsy disclosed, he said it showed him to have been "in a state of very advanced sclerosis. All of the coats of the abdominal aorta were thickened and hardened in a solid mass from the diaphragm down to the division in the legs," and that "he had suffered from that disease from 10 to 15 years." "This man died," he testified, "with lobar pneumonia," and added that he had been suffering from that disease at least 10 days. He continued:

"Assuming that a man of the age of Mr. Ostrander sustained abrasions as a result of a fall, while going up stairs of something like 5 to 8 feet; assuming that such a fall occurred and produced these abrasions that I have described on the arms—such a fall, if one did take place, could not cause death. In my opinion, these abrasions, or such a fall, which has been assumed here, if it did occur, did not cause the death of Mr. Ostrander. From my examination of this Mr. Ostrander on this day, the probable cause of such a fall, if such a fall did occur, may have been due to a dizziness produced by a disturbance of the circulation in his brain, depending upon his arteriosclerosis, and it may have been due to a weakness due to the toxæmia from his pneumonia. Those are two things which might have caused him to fall. It would be apt and likely to produce vertigo. It would cause dizziness, and toxæmia will cause the dizziness. With a man of that age, with the sclerosis condition of his blood vessels, and with incipient pneumonia, it could be a usual and ordinary thing to discover that he is having dizzy spells. It could be a fact that he did have a dizzy spell, that could be symptomatic of the condition which I have just described."

A third witness, who was engaged in general medical practice in the city of Syracuse, was 60 years of age, and had been associated with the Crouse-Irving Hospital in that city for 8 or 9 years, and had been practicing since 1893, called by defendant, testified that the cause of death was lobar pneumonia. He based his opinion upon the hospital record of

Ostrander, and upon the report of the autopsy.

The defendant called as a witness the man who was in charge of the Salvation Army Hotel at Auburn while Ostrander was making it his headquarters. He testified as follows:

"I saw him often walking around, or rather shuffling around, the hotel lobby, as he didn't seem to be able to walk, always dragged his feet around, so, and saw him several times out on the street, and saw him holding up the lamp post, or up against the wall. Saw him several times standing up against the street corners and lamp posts in different parts of the city, and going around the hotel I saw him several times walk along, and then he would make a run until he got up against the wall, or something that would stop him. In walking in the hotel, I have observed him lose control or balance."

He further testified:

"When he came first to the hotel, he said he was coming to be treated for his legs, some trouble with his legs. Otherwise, he said, he felt pretty good, but his legs, that he hadn't control of them, and that he wasn't able to climb stairs. I wanted to give him a room on the third floor, and he said, 'No'; that he wasn't able to get up so far as that, and he asked me if I would give him a room on the floor underneath, second floor, one flight upstairs, and I said, 'Yes.'"

A number of witnesses testified as to his difficulty in walking. A gentleman living in Auburn, and engaged in the wholesale paper business there, and who had at one time employed Ostrander as a traveling salesman was asked about the man's physical condition. He answered: "I saw that he was very feeble. He could—well it was a great effort for him to walk. He shuffled his feet." "He walked totteringly," as if he did not have good control of his legs.

Another witness testified:

"He was never a fast walker, but for the last two or three years, he developed a scuffle or shuffle; didn't pick up his feet like he formerly did, and was unsteady on his feet, and I have been walking along the street with him when he would start forward quick and grab me as he did to hold himself back."

And the same witness, testifying to meeting Ostrander on the street a few weeks before this accident, asked him how he was, and stated that Ostrander replied: "I feel pretty good, if it wasn't for my damned legs." He said: "I cannot walk good, and I am going to try and get some treatment, and see if it will help me." And a medical witness testified that "apparent shuffling of

the feet, or apparent tottering of the body, would be a usual symptom of an advanced state of arteriosclerosis; that is the usual condition to be found in an old man—the tottering of the body or lack of control of the legs."

At the close of the case, one of the two medical witnesses who had testified on behalf of the plaintiffs was recalled to the stand and allowed to be re-examined, although defendant's counsel objected on the ground that it was not proper rebuttal testimony and amounted to a reopening of the case. His re-examination took a wide range, and on cross-examination he stated:

"I have been teaching 13 years; I don't go out and treat patients for money, and have not for 13 years. I have had no practical experience at medicine in the city of New York, but I do not take money for it. I don't know, of my own personal knowledge, a solitary thing about this man Ostrander's condition."

He stated also that he did not think that the physicians called by the defendant, and who had conducted the autopsy on Ostrander, knew more about what was the matter with him than he did.

The District Judge, in his charge, stated that it was necessary that the plaintiffs should prove their case by a preponderance of evidence, "upon the facts which the plaintiffs are required to establish, and those facts are that the deceased, Lewis Ostrander, did receive an injury which was effected through external, violent, and accidental means, and that that injury was the cause of his death, alone and independent of all other causes." "That does not mean that the deceased, Lewis Ostrander, must have died immediately from the result of the injury. It does not mean that the deceased must have been killed instantly. But it does mean that, without the injury, or injuries, which the deceased received, he would not have died, and that his death was not contributed to in any manner or degree by any disease which he had at or before the time of the injury."

"If, however, as the plaintiffs contend, the injuries which the deceased received on the day in question, which was the 14th day of December, 1922, caused lobular pneumonia, which would not have been caused except for the injuries which he received, and the lobular pneumonia resulting only from the injuries so received was the immediate cause of death, if you are satisfied of that by a fair preponderance of the evidence, then the plaintiffs are entitled to recover."

"The defendant contends that the inju-

ries which the deceased, Lewis Ostrander, received, which have been described in the evidence here as two abrasions, as I recall it, on the arms, were of relatively no importance, and that he received these injuries because he fell, not from tripping on the stairs, or from any other cause external to himself, but that he fell because he was afflicted occasionally with a weakness, or vertigo, which would cause him to fall unless he grabbed something or some one to prevent himself from falling, and that at the time he fell, or prior thereto, he had pneumonia which was not a secondary pneumonia (that is, a pneumonia which ordinarily would be caused by some injury or shock), but that he had a pneumonia of a different type, called a lobar pneumonia, which pneumonia, in and of itself, was the cause of death, which did not result from any fall he had, if he had a fall, and which had no relation to the fall, and which would have caused his death, fall or no fall."

And, after calling the attention of the jurors to the evidence upon which each side relied, at the conclusion of his charge the court said:

"There you have the two pictures presented by the two sides. Unless you are satisfied by a fair preponderance of evidence that the death was due to lobular, or secondary, pneumonia, and that that was in this case brought on and caused solely by reason of the injuries and the reduced vitality resulting from the accident, the impairment of the strength of the deceased's human organism—unless, I say, you are satisfied of that by a fair preponderance of the evidence, then you must find a verdict in favor of the defendant of no cause of action."

Then this occurred:

"Mr. Murphy: I ask your honor to say to the jury that if they find as a fact that disease contributed to Mr. Ostrander's death in any degree, the plaintiffs cannot recover.

"The Court: I charge you that, gentlemen, meaning by that, disease existing at the time, on the 14th day of December, 1922, and I think I should say further that arteriosclerosis of certain arteries of the body is not disease within the meaning of the word in this charge.

"Mr. Murphy: I except to your honor's declining to charge as requested and to the charge as modified."

The constitution of the defendant contained the following provision:

"Class A insured members shall be indemnified in accordance with the terms hereinafter set out in this article, against the re-

sults of bodily injury hereinafter mentioned, effected through external, violent, and accidental means, herein termed the accident, which shall be occasioned by the said accident alone and independent of all other causes."

It further provided:

"Nor shall benefits under this article be payable nor extend to any cause of death or loss of time, where the death or loss of time was contributed to by disease in any degree."

And the certificate upon which the suit was brought contained the following provisions:

"This certificate, the constitution, by-laws, and articles of incorporation of said order, together with the application for insurance signed by said insured member, shall constitute the contract between said order and said insured member. * * *"

"Nor shall benefits under this article be payable unless external, violent, and accidental means, producing bodily injury, is the proximate, sole, and only cause of the death, disability or loss."

[1] These various provisions constitute a part of the contract which these parties made, and by which their rights are to be determined. Collins v. Collins, 30 App. Div. 341, 51 N. Y. S. 922; Sasse v. Order of United Commercial Travelers, 168 App. Div. 757, 154 N. Y. S. 558.

It thus appears that the contract these parties made was limited to an insurance against the results of bodily injury "effected through external, violent, and accidental means" which shall be the sole and only cause of the death, disability or loss. The question therefore presented is whether Ostrander's death was due to "external, violent, and accidental means," and resulted from the accident "alone and independent of all other causes," and there can be no recovery by the parties' own express agreement if the death was "contributed to by disease in any degree." We must construe the contract according to its terms.

[2] There is no doubt that the burden rested on the plaintiffs to satisfy the jury by a preponderance of proof that Lewis Ostrander came to his death as the result of bodily injuries effected solely by the accident, alone and independent of all other causes, and that it was not contributed to by disease in any degree. Travelers' Insurance Co. v. McConkey, 127 U. S. 661, 8 S. Ct. 1360, 32 L. Ed. 308.

In Commercial Travelers' Mutual Accident Association of America v. Fulton, 79 F. 423, 24 C. C. A. 654, this court had before it an accident insurance case. The poli-

cy provided that "the insurance under this contract shall not * * * extend to or cover accidental injuries or death resulting from or caused directly or indirectly, wholly or in part, by * * * disease in any form, or while effected thereby." The court reversed the judgment, and granted a new trial because of the charge to the jury. This court said:

"There are undoubtedly many passages in the charge which plainly indicate the correct rule that plaintiffs could not recover unless the jury were satisfied that the accidental injury was sufficient of itself to cause death to a healthy man; but upon the other hypothesis, which the evidence warranted, namely, that the fall produced a shock which called for responsive action from the heart, which it was too weak to give efficiently, the general effect of the charge failed, in our opinion, sufficiently to impress upon the jury that, if the disease thus contributed to cause death, plaintiffs could not recover."

This court in Ætna Life Insurance Co. of Hartford v. Ryan, 255 F. 483, 166 C. C. A. 559, had occasion to consider an accident policy of insurance. The policy provided that no indemnity was payable unless the insured was injured or came to his death "directly and independently of all other causes, from bodily injuries effected solely through external, violent, or accidental means. * * *" On the morning of August 25, 1917, the assured, while entering a subway train in New York City, was struck by closing of the car door, and it was claimed that the blow developed a cerebral hemorrhage, and that the hemorrhage resulted in his death on September 9th. The testimony disclosed that the man had arteriosclerosis, and that the disease was in a well-advanced stage and affected his entire vascular system. The diseased condition extended throughout all parts of his body, including his brain. The medical testimony showed that, while the immediate cause of death was the cerebral hemorrhage, arteriosclerosis, chronic diffuse nephritis, myrocarditis were contributory causes. A large number of the cases are referred to in that decision, and we stated that they showed "that there can be no recovery if the insured sustained an accident, but at the time it happened was afflicted with a pre-existing disease, and if the death would not have resulted if he had not had the disease, but his death was caused because the accident aggravated the effects of the disease or the disease aggravated the effects of the accident." In that case the court submitted the question to the jury on a different theory, and this court reversed on the ground that "a verdict and a judgment so obtained cannot be permitted to stand." Since the decision in the Ryan Case was rendered, the Circuit Court of Appeals for the Eighth Circuit has followed it in Kerns v. Ætna Life Ins. Co., 291 F. 289, 292. Without again reviewing the case, we content ourselves with the statement that this court adheres to what was said in the two cases last cited, and which we regard as controlling in the instant case.

[3] In view of the contract upon which this action was brought, and of the condition therein that the death of the insured must have been occasioned by the accident alone and "independent of all other causes," and that there was to be no liability "unless external, violent, and accidental means, producing bodily injury, is the proximate, sole, and only cause of the death, disability or loss," we do not doubt that the court erred in the qualification it attached to the instruction counsel for the defense requested the court to give at the conclusion of the charge. We have seen that he was asked to charge that plaintiffs could not recover if disease contributed to Ostrander's death in any degree. He gave that charge, but qualified it by saying, "I should say further that arteriosclerosis of certain arteries of the body is not disease within the meaning of the word in this charge." We are at a loss to understand how the judge came to give such an instruction to the jury which practically required them to disregard all the testimony in the case as to Ostrander's being afflicted with arteriosclerosis. Although in his charge he called the jury's attention to much of the testimony, he had completely ignored the whole testimony showing that Ostrander was suffering from arteriosclerosis. And then, when the above request was presented, he gave the above instruction. He might as well have instructed them to find a verdict for the plaintiffs. For, in effect, he instructed them to disregard all the testimony given indicating that the man was afflicted with arteriosclerosis.

One of the plaintiff's medical witnesses testified, "I am familiar with the disease of arteriosclerosis." One of the medical witnesses called by defendant testified, "I have made a general study of the disease known as pneumonia, and also of a disease known as arteriosclerosis." The other medical expert called by defendant, and who testified as to the arteriosclerosis which he found at the autopsy upon Ostrander's body, said that Ostrander had suffered from "that disease" from 10 to 15 years. The only other medical

witness who testified stated that: "Arteriosclerosis is a condition that exists in an old man. It makes a man grow old faster, dependent upon the extent to which he is suffering from that disease."

[4] In the Century Dictionary the word disease is defined as "deviation from the healthy or normal condition of any of the functions or tissues of the body." And in Webster's International Dictionary the word is defined as "an alteration in the state of the body, or of some of its organs, interrupting or disturbing the performance of the vital functions, and causing or threatening pain and weakness." The New Standard Dictionary speaks of arteriopathy as "disease of the arteries in general," and of arteriosclerosis as "the thickening and hardening of the walls of an artery." The arteries, like the brain, the lungs, and the other organs of the human body may become diseased. It is common knowledge, of which this court can take judicial notice, that arteriosclerosis is a frequent cause of death, and that one who is in an "advanced state of arteriosclerosis," as it was testified Ostrander was, is not only diseased, but very dangerously diseased.

In this case the sole question was whether Ostrander's death was caused by violent, external, and accidental means. The theory of the plaintiffs was that he met his death because of a fall he had in going up a stairway. Three physicians testified that the fall might have been due to arteriosclerosis, and that evidence stood uncontradicted. There was evidence in the record, in addition to that heretofore referred to, as to his difficulty in walking, and which was quite significant. For example one witness testified:

"I had a conversation with Mr. Ostrander relative to his physical condition. He told me he had a bad spell at Batavia, sort of a dizzy spell, and he ran his head into the corner of a passenger station and crushed his hat and fell, and some one called a taxi and sent him to the Richmond Hotel."

He also testified:

"I was standing talking with him and asked him how he was feeling, and so forth, and so on, and all at once he said, 'Gardner, I am dizzy,' and he fell forward, and I grabbed him; he fell so far that I grabbed him with both arms and prevented him from falling, and I looked around to see if there was a chair near him, or us, and there was a chair I should judge, an arm chair, about 4 feet from where we stood, and I partly lifted him and assisted him to this chair."

And, testifying as to another occasion, he said:

"I met him a few days later at the corner of State and Genesee streets. I was crossing the street, going towards him, and he was standing perfectly still. 'Well,' says I, 'Hello, Ostrander. What is the matter?' He said, 'Gardner, help me to my room.' So he leaned heavily on me, on my arm, and I walked very slowly to North street, and then down a little ways on North street and into this alley that led to the front door of the Salvation Army Hotel, and, said he, 'Now, I will be all right; I can get up the stairs.' * * *"

There was testimony from another witness showing that he fell at Medina and broke two of his ribs:

"I knew at this time that he was 67 or 68 years of age, and that he had fallen and broken two ribs in the previous spring, on account of having this accident at Medina."

A jury might naturally infer that arteriosclerosis might have caused the fall of December 14, 1922, but they were in effect instructed that, if it did, it was to be disregarded as not being caused by disease.

And the decisions of this court hereinbefore referred to, in Commercial Travelers' Mutual Accident Ass'n of America v. Fulton, 79 F. 423, 24 C. C. A. 654, and in Ætna Life Insurance Co. of Hartford v. Ryan, 255 F. 483, 166 C. C. A. 559, are ample justification for the reversal of this judgment, quite irrespective of the particular instruction upon which we have above commented.

[5-8] We may take occasion to say that the object of instructions is to direct the attention of the jury to the legal principles which apply to the facts in such a manner that the jury may not be misled. The extent to which the court should go in reviewing and commenting on evidence depends in great measure on the circumstances of the particular case. In a case such as this, in which reliance is placed on expert or opinion evidence, it is important to point out to the jury that the opinion of an expert has no probative force in case the jury fails to find that the facts assumed in the hypothetical question were true. And a court should not permit a jury to be influenced by evidence on which they cannot, within the laws of correct reasoning, make a finding. We think the jury in this case might well have been instructed, in considering purely expert testimony and the weight to be attached to it, that it was their duty to consider whether the facts embodied in the hypothetical question had been established by a preponderance of the evidence. But it does not appear that any request so to charge was made. And the general rule is that mere nondirection, in the

absence of request, does not ordinarily constitute error. Encycl. on Pl. & Pr. vol. 11, p. 217.

[9.] While in this opinion we have discussed this case fully, upon other grounds, there is another ground upon which it might have been disposed of summarily. At the close of plaintiff's case, counsel for defense asked that the complaint be dismissed on the ground that the plaintiff had not made out a prima facie case. The motion was denied. At the close of the case, after both sides had rested and before the jury was charged, counsel for the defense asked for the direction of a verdict in favor of defendant, on the ground that there was an entire absence of testimony showing that death was the result of an accident and independent of all other causes. This was denied, and, as we have seen, the case was submitted to the jury after what we regard as a clearly erroneous charge. The physician who attended Ostrander at the hospital testified that lobular pneumonia was the direct cause of the man's death. But neither he nor any other witness testified that in his opinion Ostrander's death was occasioned by accident alone and was independent of all other causes. In order that plaintiffs might recover, it was necessary for them to prove that disease did not contribute "in any degree" to cause death. To say that the fall caused shock, shock caused lobular pneumonia, and the latter caused death, does not prove the plaintiff's case, even if a jury believed it; for in such a case disease would contribute in some degree to cause death. There is no right of recovery under the contract sued upon if disease contributed in any degree to cause death. A verdict and judgment obtained in entire disregard of the express terms of the contract cannot be permitted to stand.

Judgment is reversed.