HANOVER FIRE INSURANCE COMPANY, Appellant,

v.

Martha SIDES and Russell L. Sides, Appellees.

No. 19917.

United States Court of Appeals Fifth Circuit.

July 26, 1963.

P. A. Bienvenu, Bienvenu & Culver,. and Timothy J. McNamara, New Orleans,. La., for appellant.

Robert J. Mack, of Sims & Mack, Hammond, La., for appellees.

Before PHILLIPS,* WISDOM and. GEWIN, Circuit Judges.

PHILLIPS, Circuit Judge.

Russell L. Sides and his wife, Martha. Sides, filed separate actions against Hanover Fire Insurance Company to recover damages for personal injuries and property loss sustained in an automobile collision between their passenger automobile and a truck owned by Florida Parishes Distributing Company and operated by its employee, A. A. Duplessis, acting in the course of his employment. The collision occurred on U. S. Highway 51,. between LaPlace, Louisiana, and Ponchatoula, Louisiana. At the time of the:

---

* Of the Tenth Circuit, sitting by designation.

collision, Hanover had in force and effect a policy of liability insurance covering the Distributing Company's truck. The actions were brought against Hanover under the Louisiana Direct Action Statute (LSA–R.S. 22:655) and were consolidated for trial. The jury returned verdicts of $12,800 for Russell Sides and $4,900 for Martha Sides. A joint judgment was accordingly entered and Hanover has appealed.

Highway 51 is the main road between LaPlace, Louisiana, and Ponchatoula, Louisiana. It is a two-lane road of average width and at the time of the accident was full of "ruts, holes, and bumps and waves." Duplessis and the Sides traveled through rain throughout the morning of March 26, 1959, the day of the accident, and it was raining when it happened. The collision occurred just south of the point where Highway 51 crosses North Pass. A new bridge over such Pass had been constructed and the approach to such new bridge angled off to the west from Highway 51 for a short distance and then ran north to the new bridge. The approach road was surfaced with shells and at some time prior to 10 a. m. on March 26, 1959, employees of the State Highway Department barricaded the highway south of the old bridge and commenced detouring traffic from the old road over the south approach to the new bridge, in order to gain compaction of the surfacing material on such approach road.

Signs which the Highway Department had erected along Highway 51 to the south from the barricade were in place as Duplessis and the Sides approached the point where the approach road to the new bridge joined such highway— the detour point. Such signs were: One reading, "Slow Repairs" 1,000 feet south of the new construction area; to the north of such sign, one reading, "15 Mile Speed Limit"; approximately 400 feet south of the detour point, a sign reading, "Barricade Ahead"; about 230 feet south of the detour point a sign reading, "Slow"; just south of the detour point

one reading, "Detour" with an arrow pointing to the west, or left.

There were also two detour signs with arrows pointing to the west on the barricade, but shortly before the accident, because of the rain, the Highway Department decided to close the detour and reopen the old road. It had removed the barricade, but had not taken down any of the signs mentioned above, except the two on the barricade, prior to the accident.

Mr. and Mrs. Sides were traveling north on Highway 51 in their 1955 Oldsmobile automobile and at approximately 10 a. m. they approached the segment of road where the above-mentioned signs had been erected. Sides observed such signs. Because of the rain and road conditions, he had been traveling 20 to 25 miles per hour. When he observed the warning signs, he reduced his speed. As he approached the detour sign, he saw such sign, the approach road to the new bridge, such bridge, and the old bridge. He saw no barricade, because it had been removed. He was uncertain whether he should turn to the left, onto the approach road to the new bridge, or continue on to the old bridge. He testified that being thus uncertain, he further reduced his speed by removing his foot from the gas pedal and letting the vehicle coast. Mrs. Sides testified he had slowed down to 15 miles per hour before the accident. Sides further testified that he neither turned to the right nor to the left, that he knew he "didn't make any turns"; and that before he had made up his mind which way he should go, he lost consciousness and remembered nothing more until he regained consciousness in his automobile, which had stopped in a highway drainage canal along the highway and was sitting in water. Mr. and Mrs. Sides got out of the automobile and waded out of the canal. The canal water was knee-deep. Sides further testified he did not hear the truck approaching or a horn just before the collision.

Mrs. Sides further testified she was riding on the right-hand side of the front seat of the automobile; that she saw the

signs mentioned above; that Sides had been driving 25 miles per hour, but slowed down when he observed the warning signs, and that as he approached the detour sign he was not traveling over 15 miles per hour; that the detour road appeared "very shelly" and they expressed doubt that it would support an automobile; that Mr. Sides was uncertain which way to go; that he further reduced his speed by "coasting," but that he "did not turn"; that while he was undertaking to determine which way to go the impact came and she remembered nothing more until she regained consciousness in the automobile, which had stopped in the canal.

About a mile south of the old North Pass Bridge on Highway 51, there is another bridge, known as Manchac River Bridge. The grade of the south approach to the Manchac Bridge is four and one-half per cent.

Duplessis testified that he was familiar with Highway 51; that he had been driving over it five days a week for three years; that he knew the highway was slippery when wet; that prior to the accident he had followed the Sides automobile for six to ten miles; that the distance between his truck and the Sides automobile varied, but it was always within the range of his vision; that his truck was loaded; that he was traveling approximately 25 miles per hour. He admitted he did not see the warning signs and did not reduce his speed until he saw the Sides automobile's brake lights show about 150 yards ahead of him, just shortly before the accident. He further testified that as he came onto the approach of the Manchac Bridge, because of the grade he shifted to a lower gear, and that the Sides automobile traveled faster over the approach and bridge and increased the distance between it and the truck, and that after he crossed the Manchac Bridge he gained on the Sides automobile until he was only 150 yards behind it; that when he reached that distance from the Sides automobile, he saw its brake lights go on and then it "seemingly pulled over to the righthand side

of the road" and he thought it was going to pull over onto the shoulder and he decided to go around the Sides automobile and that he blew his horn and resumed his speed and as he got up to the Sides automobile he saw it "coming back across the highway"; that he sounded his horn again and pulled over onto the left shoulder of the road and his truck collided with the Sides automobile; that his truck traveled a distance of 140 feet after the collision before it stopped; and that the road was very slippery. He testified further that the Sides automobile was traveling very slowly at the time of the collision; and that the tire rack immediately in front of the rear trailer wheels collided with the Sides automobile.

However, a member of the Louisiana State Police, who investigated the accident about an hour after it occurred, testified that he examined the marks on the truck caused by the collision; that they showed the area of impact on the truck was the side of an extra tank, known as a saddle tank, located on its right side, immediately behind the cab; that the tank did not protrude outwardly farther than the side of the cab; that the left rear of the Sides automobile was mashed inward and that the highway was "awfully slippery."

Photographs of the Sides automobile taken after the collision and admitted in evidence show that the areas of impact on such automobile were the rear of the left rear fender, the left side of the rear bumper, and the left rear of the trunk. In other words, they showed the Sides automobile was struck from the rear and not from the side. They show also that the Sides automobile was crushed by the impact over the area embracing the left half of the rear bumper, the left half of the trunk lid, and the left fender behind the left rear wheel.

An employee of the Highway Department, who was sitting in a truck a short distance south of the detour sign, testified he observed the Sides automobile and the truck as they passed him; that in his opinion the truck was traveling 40 miles per hour; that he heard the noise caused

by the impact as they collided; and that he looked and saw the automobile in the canal and the truck trying to "get back straight up on that Main 51 highway."

The state police officer testified Sides stated he was in the process of making a left turn when the accident occurred. Sides testified he did not remember making any such statement; that he was most surprised when he heard such testimony by the police officer, and if he made such statement he must have been dazed; that he knew he did not make any turns.

Sides testified that he had paid $3,800 for his automobile; that at the time of the collision it had been driven about 22,-000 miles; and that after the collision he sold the salvage for $225.

At the time of the trial, March 29, 1962, Sides was 68 years of age. He was employed by the Shaeffer Pen Company for a long period of years, but had retired in 1959, before the accident. Following the accident, the Sides went to Ponchatoula, Louisiana, where they were examined at Scott's Clinic by Dr. Scott. They then went to a hotel at Hammond, Louisiana, where they remained four days, and then returned by train to their home in Dayton, Ohio. On April 1, 1959, they consulted Dr. Harold F. Koppe, who sent them to a radiologist for X-ray pictures. After the X-ray pictures were obtained and on April 9, 1959, he made a very complete examination of each of the Sides. Dr. Koppe prescribed medication, diathermy treatment, and sent them to an osteopathic physician for osteopathic treatments. He again examined Mrs. Sides on April 20, 1959, March 4, 1960, and November 7, 1961, and examined Mr. Sides 10 times after April, 1959, and up to and including January 10, 1962.

The expert testimony of Dr. Koppe, by deposition, and the testimony of the Sides constituted substantial proof that the Sides suffered the injuries hereinafter set out, as the proximate result of the collision.

Each of them suffered a whiplash injury. A whiplash injury is caused by a sudden and unexpected forced movement of the neck of an individual while he is in a relaxed condition and against which he cannot protect himself.

On April 9, 1959, Sides had painful neck muscles, a 20 per cent limitation of motion in the rotation of his head—the ability to turn his head; a painful left shoulder, with 10 per cent limitation of motion—ability to raise his left arm; a large hematoma—blood clot—in his left leg; pain and swelling in both lower legs; and a number of abrasions. He had osteoarthritis between the fifth and seventh cervical vertebrae. The whiplash injury caused more disability to his neck, because of the existing arthritic condition. The whiplash broke up existing adhesions, which aggravated the condition and made it painful.

Sides continued to suffer from lack of neck motion, soreness, pain, headaches, morning nausea, up to and including the time of the trial. He had not so suffered prior to the accident.

Mrs. Sides was 63 years of age at the time of the trial. On April 9, 1959, she had muscle spasm and tenderness in the back part of her neck on the right side; tenderness over a surgical scar on her abdomen; and was in a nervous state. On March 4, 1960, she suffered from left occipital pain, limitation of head movement and pain if movement was forced; there was limitation of neck rotation to the left and muscle pain on flection; she suffered from frequent and severe occipital headaches in the lower part of her skull and upper part of her neck. In November, 1961, she still suffered from headaches and tension. Dr. Koppe testified that at the time he gave his deposition, January 15, 1962, the pain in her neck still continued and that it "dates from the injury." At the time of the trial Mrs. Sides was still so nervous she could not drive an automobile or operate a typewriter.

Sides suffered more pain during cold than during warm weather. He was still taking heat treatments prescribed by Dr. Koppe three times each week, at the time of the trial.

Neither Mr. Sides nor Mrs. Sides suffered from any of the disabilities we have

set forth above prior to the accident. Sides's arthritic condition was not disabling or painful before the accident.

Sides further testified that prior to the accident he had planned to go into the business of manufacturer's agent, a business he had conducted successfully before he worked for the Shaeffer Pen Company, but because of disabilities caused by the accident, he was unable so to do.

Sides testified that he expended $646 for medical services, treatments and drugs, and that he and Mrs. Sides traveled from Dayton, Ohio, to New Orleans, Louisiana, and return, at Hanover's request, in order to undergo physical examinations by a physician employed by Hanover and to give their depositions and the cost of so doing was $450.

Dr. Harry Morris, an orthopedic surgeon, testified for the defendant, that he had examined Sides on February 12, 1960, and found degenerative arthritis in the cervical spine; that Sides had recovered from any injuries suffered on March 26, 1959; and that the arthritic condition could not be related to the injuries sustained on March 26, 1959.

He further testified that he examined Mrs. Sides on February 12, 1960; that he could find no reason for her complaints of neck discomfort and headaches; and that he felt she had recovered from any injuries which she might have sustained on March 26, 1959.

■ Hanover contends that the court erred in denying its motion for a directed verdict and its motion for judgment notwithstanding the verdict or for a new trial, on the ground that the verdict was not supported by the evidence and the damages awarded were excessive. In Greyhound Corporation v. Dewey, 5 Cir., 240 F.2d 899, this court said:

"In reaching its conclusion as to negligence and proximate cause a jury is frequently called upon to consider many separate strands of evidence and from these to draw its ultimate conclusions. Jury findings on conflicting evidence are binding on this Court, which accepts as true that version of the testimony the jury might reasonably have adopted in reaching its verdict. Appellant can succeed only if it establishes that there is no substantial evidence to support the verdict, considering the evidence in the light most favorable to the appellee and clothing it with all reasonable inferences to be deduced therefrom."

■ Here there was substantial evidence from which the jury might reasonably have found that Sides slowed down when he reached the warning sign area; that he further reduced his speed as he approached the detour road; that he traveled only in the right lane and neither turned to the right nor the left; and that Duplessis increased his speed after he crossed the Manchac River Bridge and was driving at a speed of 40 miles per hour on a slippery road that had a posted speed of 15 miles per hour; that when Sides slowed down a short distance south of the detour road, Duplessis was so close he could not stop in time to avoid the collision, and that when he endeavored to go around the Sides automobile, his truck, at a point immediately back of the cab, collided with the left side of the rear bumper, the left rear portion of the body and the back of the left rear fender of the Sides automobile. The location of the areas of impact, respectively, on the Sides automobile and on the truck, supports Sides's testimony that he made no turns and negates the testimony of Duplessis that Sides was making a left turn.

Both Mr. and Mrs. Sides suffered whiplash injuries, which caused severe pain and substantial disabilities, and while they had improved by the time of the trial they still were disabled and continued to suffer pain. Mr. Sides could not undertake the business he had planned to establish and Mrs. Sides could not drive a car or write on her typewriter.

■ In addition to such pain and suffering and the disabilities proximately caused by the negligence of Duplessis, Sides suffered almost a complete loss of his automobile and incurred expenses

for medical services, medicines and treatments, and for travel at Hanover's request. We are of the opinion the awards were justified. Clearly, they did not indicate bias, prejudice, passion, or caprice on the part of the jury. Moreover, the question of excessiveness of a verdict is for the trial judge and his determination will ordinarily not be disturbed on appeal.[1]

Section 235, Title 32, Vol. 18, West's Louisiana Statutes Annotated (18 LSA–R.S. 32:235) reads:

"§ 235. *Turning*

"A. The driver of any vehicle on the highways of this state shall ascertain, before turning around upon any highway, that there is no traffic, vehicular, or pedestrian, approaching from either direction which will be unduly delayed and shall yield right-of-way to such approaching traffic and shall not attempt to make a turn unless the way is clear.

"B. Except as otherwise provided in this Section, the driver of a vehicle intending to turn to the right at an intersection shall approach such intersection in the lane for traffic nearest the right hand side of the highway, and in turning shall keep as closely as practicable to the right hand edge of the highway, and when intending to turn to the left shall approach such intersection in the lane for traffic to the right of and nearest the center line of the highway and in turning shall pass beyond the center of the intersection, passing as closely as practicable to the right thereof before turning to the left.

"C. For the purpose of this Section, the center of the intersection shall mean the meeting point of the medial lines of the highways intersecting one another."

Subsection A of the statute, if literally construed, would apply only to a situation where a motorist "turns around," i. e., reverses his direction, in common parlance called a U-turn, but the courts of Louisiana have consistently applied it in left-turn cases.[2]

The trial court charged the jury with respect to left turns, in pertinent part as follows:

"I charge you that under the law of Louisiana, a left turn is a dangerous maneuver. A motorist attempting a left turn is under the duty to exercise a high degree of care. In making a left turn the driver must ascertain before turning that the way is free of oncoming and overtaking traffic, which will be interfered with by his intended action.

"A motorist trying to execute a turn shall yield the right of way to traffic from either direction. He shall not attempt, or should not attempt, to turn unless the way is clear and the turn can be made in safety.

\*  \*  \*  \*  \*  \*

"You are the exclusive judges of whether a turn was about to be made. I won't decide that for you. You will have to decide it.

\*  \*  \*  \*  \*  \*

"The driver of a vehicle intending to turn to the left shall approach such intersection in the lane for traffic near the center line of the highway, and in turning shall pass beyond the center of the intersection, passing as close as is practicable to the right curb before turning to his left.

"Section 236 talks about signals that you must give for turns. Most of you are familiar with the hand signals which you have to give for

1. Southern Ry. Co. v. Montgomery, 5 Cir., 46 F.2d 990, 991; Lycon v. Walker, 8 Cir., 279 F.2d 478, 485; Russell v. Monongahela Railway Company, 3 Cir., 262 F.2d 349, 352.

2. Hoffpauir v. Southern Farm Bureau Casualty Ins. Co., La.App., 124 So.2d 409, 411, 412; Madison v. Southern Farm Bureau Casualty Ins. Co., La.App., 120 So.2d 342, 344; Samples v. Strait, La. App., 36 So.2d 856, 858; Michelli v. Rheem Mfg. Co., La.App., 34 So.2d 264, 268; Lane v. Bourgeois, La.App., 28 So. 2d 91, 95.

a right turn or a left turn. This section states that the driver of any vehicle upon a highway of this State, before starting, stopping or turning from a direct line, shall first see that such movement can be made in safety, * * *. If you have a turn indicator and you want to turn left you indicate. If you don't have a turn indicator, you make a left turn by horizontally extending your left arm straight out.

\* \* \* \* \* \*

"I charge you that a driver, on making a left turn across a road, must not only give a signal of his intention to so do, but he must give that signal when he is a sufficient distance from the intersection to allow the following vehicle to take precautions to avoid running into the one making the turn."

■ The trial court charged the jury fully and accurately with respect to the duties and requirements imposed on a driver of a vehicle making a left turn on a Louisiana highway by § 235, supra, as construed by the Supreme Court of Louisiana, and also by § 236, Title 32, Vol. 18, West's Louisiana Statutes Annotated. The court also fully and properly charged the jury with respect to negligence and contributory negligence.

Hanover requested and the trial court refused six instructions with respect to the duties and requirements imposed on the driver of a vehicle on a Louisiana highway making a left turn.

■ While the requested instructions stated correct propositions of law, they were substantially and correctly covered by the instructions given by the court. To have given such requested instructions would have been merely repe-titious, would have unduly emphasized Hanover's theory of the case, would have tended to confuse, rather than aid the jury, and would have defeated the object of giving instructions, which is to give the jury a clear and concise statement of the law applicable to the facts of the case.[3]

■ Where a trial court has substantially and correctly covered in its general charge the propositions set forth in a requested instruction, it may and ordinarily should refuse such requested instruction.[4]

■ Had the jury believed the testimony of Duplessis, under the instruction given by the court, they would have returned a verdict for Hanover. We think it clear the jury concluded that Sides was not making a left turn at the time of the collision. That conclusion is almost compelled by the physical facts with respect to the areas of impact on the rear of Sides's automobile and on the right saddle tank of the truck, respectively. Had Sides been making a left turn, the impact would have been on the left side and forward of the rear of the automobile, instead of at the left rear of the fender and body. The trial judge adverted to the importance of that physical fact in denying the post-verdict motions. If the jury found that Sides was not making a left turn at the time of the collision, then the instructions with respect to left turns had no application. We conclude that Hanover was in no wise prejudiced by the instructions given and refused with respect to left turns. Hanover also requested an instruction with respect to the duties of the driver of a vehicle on the highways of Louisiana before "turning around upon any highway." It was properly refused, because there is

3. Terminal R. Ass'n of St. Louis v. Howell, 8 Cir., 165 F.2d 135, 139; Baer Bros. Land & Cattle Co. v. Palmer, 10 Cir., 158 F.2d 278, 280; Order of the United Commercial Travelers v. Nicholson, 2 Cir., 9 F.2d 7, 14; 88 C.J.S. Trial § 266, p. 726.

4. Messer v. L. B. Foster Company, 5 Cir., 254 F.2d 412, 414; David Bilgore & Co. v. Ryder, 5 Cir., 211 F.2d 855, 857; Good Holding Co. v. Boswell, 5 Cir., 173 F.2d 395, 401, cert. den. 338 U.S. 815, 70 S.Ct. 55, 94 L.Ed. 493; Allen v. First Nat. Bank of Atlanta, 5 Cir., 169 F.2d 221, 225.

no evidence that Sides was turning around upon the highway, in the sense the jury would have understood that phrase, at the time the accident occurred.

The court instructed the jury properly on sudden emergencies and did not err in refusing to give an instruction of the same import requested by Hanover.

The court properly instructed the jury with respect to proximate cause and last clear chance and did not err in refusing to give Hanover's requested instructions with respect to those matters.

With respect to proximate cause, Hanover's requested instruction unduly emphasized Hanover's evidence and its requested instruction with respect to last clear chance was defective, because it did not make the doctrine applicable to both parties.[5]

Hanover's requested Instruction 27 relates to the applicable speed limits in effect at the time and place of the collision. The court charged the jury with respect to such speed limits, basing its instruction on a Louisiana statute presented by Hanover. Hanover did not reserve its right to assign error on the instruction given or refused as to speed limits in accordance with Rule 51, Federal Rules of Civil Procedure,[6] and impliedly indicated it was satisfied with the instruction given by the court.

The trial court charged the jury with respect to the duty of the driver of an overtaking vehicle to give audible and sufficient warning of his intention before overtaking. Hanover challenges the instruction on the ground the duty to warn was not one owed to the driver of the vehicle to be overtaken. But again Hanover did not object to the charge on that ground in the trial court and is precluded from raising it here, under Rule 51, supra.

The judgment is affirmed.

5. See: Tauzier v. Bondio, 237 La. 516, 111 So.2d 756, 758; Bagala v. Kimble, 225 La. 943, 74 So.2d 172, 178; Bergeron v. Department of Highways, 221 La. 595, 60 So.2d 4, 8.

6. See: Bish v. Employers Liability Assurance Corporation, 5 Cir., 236 F.2d 62, 68; Pruett v. Marshall, 5 Cir., 283 F.2d 436, 440, 441.