70 So.2d 404 (1954)
MOORE
v.
NOLA CABS, Inc. et al.
No. 20196.
Court of Appeal of Louisiana, Orleans.
February 15, 1954.
*405 Henry L. Oulliber, Jr., and Robert J. Pitard, New Orleans, for appellants.
White & Bowes, Gretna, for appellees.
REGAN, Judge.
Plaintiff, Harriet Moore, surviving spouse of Woodson John, instituted this suit against defendants, Harold Lee Crosby, the operator of a taxicab, Lester Ott, owner thereof, and Nola Cabs, Inc., insurer, endeavoring to recover the sum of $22,458.50, for the wrongful death of her husband, which occurred during a drizzling rain, on August 18, 1952, at approximately five o'clock p. m., in the intersection of Pailet and Eleventh Streets, in the town of Harvey, Louisiana, when Woodson John, a pedestrian, 86 years of age, was struck by the taxicab as he attempted to cross Eleventh Street.
Defendants answered and denied that the driver of the cab was guilty of any negligence whatsoever and that the accident was caused solely by the negligence of the deceased (1) "in leaving a place of safety and running into the oncoming automobile which was then only a few feet from him"; (2) "attempting to cross Eleventh Street without any regard for his own safety;" (3) "in creating a sudden emergency and placing himself in a position of peril, which continued up to the moment of the accident" and, in the alternative, pleaded the foregoing acts of negligence as the contributory negligence of John.
From a judgment in the court, a qua, in favor of plaintiff in the sum of $4,458.50, defendants prosecute this appeal. Plaintiff has answered the appeal requesting that the judgment be increased to the sum of $7,900.
The record reveals that Eleventh Street is a black topped roadway, 18 feet wide, with 6 foot shoulders on each side; the cab was being operated in Eleventh Street moving in the general direction of Gretna, Louisiana, at a speed of about 30 miles per hour. John was beginning to cross Eleventh Street from the taxicab's left and where it is intersected by Pailet Street. When John had not reached the center of Eleventh Street he was struck by the left front section of the cab and knocked several feet above the taxicab. The resulting injuries were almost immediately fatal.
In addition to the operator of the taxicab only one other person, a disinterested witness, Gail Sears, claims to have been an eyewitness to the occurrence. He testified that he was seated on the porch of a residence in Pailet Street, which is about 100 to 130 feet removed from the situs of the accident, when he observed John slowly walking upon the sidewalk of Pailet Street and proceed about 3 feet onto the black *406 topped portion of the roadway of Eleventh Street, at which time the cab blew its horn, applied its brakes and John, for the first time, was aware of the cab's approach. He made an effort to step back, but simultaneously he was struck by the left front section of the cab, as it skidded from its right traffic lane into the left traffic lane where John had been standing.
Crosby, the operator of the taxicab, testified that it had been raining intermittently all day and was drizzling as he drove about 30 miles per hour in the right traffic lane of Eleventh Street; that visibility was good and he was aware of the fact that the roadway was wet and slippery. When he first observed John he was standing on the left shoulder of the roadway preparing to step upon the blacked topped portion thereof and the taxicab was approximately 20 feet removed from him. At this point in his testimony Crosby then related his version of the accident. "* * * he is looking directly at me. I figure the man see me, tooted my horn. When I did he started in front of me, and I slammed on my brakes. I just went right around and swung and hit him with the left fender of my car." "* * * He actually ran across" and I hit him in "just about around the center" of the road.
The taxicab, when the brakes were applied, went into a skid of about 50 feet, and it was during the course of the skid that the left front section of the taxicab entered the left traffic lane and struck John; upon the termination of the skid the vehicle had turned around and was again facing the direction from whence it had come.
The litigants dispute the existence of a sign regulating the speed of vehicles using Pailet or Eleventh Street at 20 miles per hour. Defendants insist that it regulated the speed of the Pailet Street traffic, which is a dirt road. However, we find as a fact that it regulated the speed of the Eleventh Street traffic, a hard surfaced roadway.
Counsel for plaintiff contend that under the doctrine announced in Rottman v. Beverly, 183 La. 947, 165 So. 153, and extended in Jackson v. Cook, 189 La. 860, 181 So. 195, it is the duty of the driver of an automobile to observe a pedestrian who may have placed himself in a position of danger and, even though that situation may have resulted from the negligence of the pedestrian, the automobile driver must avoid him if, by maintaining a diligent lookout, he could or should have seen him in time to avoid the accident.
Defendants in endeavoring to reverse the judgment of the lower court assert that the decedent was guilty of negligence in leaving a place of safety where he was standing and attempting to run across Eleventh Street in the face of approaching traffic and, therefore, there can be no recovery by the decedent's widow unless factually the case can be brought within the contemplation of the doctrines of last clear chance and discovered peril. However, defendants' counsel insist that these doctrines have no application herein and they rely on the conclusions enunciated in Fontenot v. Freudenstein, La.App., 199 So. 677; Bechtel v. Oriol, La.App., 52 So.2d 589; Duet v. Terrebonne, La.App., 52 So.2d 263; Bergeron v. Department of Highways, 221 La. 595, 60 So.2d 4; Bagala v. Kimble, La.App., 62 So.2d 523; and Silvera v. Gallardo, La.App., 63 So.2d 15.
We have made a careful analysis of these cases and find that they are all factually distinguishable and all hold, in conformity with the facts found, that the defendant in each case did not possess the last clear chance to avoid the accident since he was not afforded an opportunity to discover, despite maintaining a vigilant lookout, the pedestrian's peril.
We are of the opinion that this case is encompassed by the rationale expressed by the Supreme Court in Rottman v. Beverly, supra, and Jackson v. Cook, supra. [189 La. 860, 181 So. 197].
In the latter case the Supreme Court said:
"`The first duty of those who operate engines or motor vehicles is to keep a sharp lookout ahead to discover *407 the presence of those who might be in danger.'
"* * * the duty of those in charge of motor cars and engines to look ahead and observe never ceases; that what they can see they must see and in legal contemplation they do see; that their failure to see what they could have seen by the exercise of due diligence does not absolve them from liability.
"Up to the time the Court of Appeal decided the Rottman Case [Rottman v. Beverly], 162 So. 73, the jurisprudence relating to the last clear chance doctrine was confusing. This court in several cases had said in general terms that, where the negligence of a plaintiff continued up to the moment of the accident, there could be no recovery. Such statements had been made without qualification, and what we held in the Rottman Case was that such statements were too broad, and we qualified the rule by holding that, when a defendant sees another in peril of which the other is not aware, then a second or subsequent duty arises and devolves upon the defendant, which duty is to use every possible available means to avert injury. We said:
"`If the defendant fails to perform that duty, his negligence in that respect is regarded as the proximate and immediate cause of the injury and the negligence of the plaintiff in putting himself in a place of danger, the remote cause. In such cases the last clear chance doctrine applies even though plaintiff's negligence continues up to the accident.'"
In the present case, Crosby, the operator of the taxicab, testified that even though a drizzling rain was falling, visibility was good, but that he failed to observe John until he was only 20 feet removed from him. John by this time had crossed the 6 foot shoulder and entered the black topped portion of the roadway. Obviously Crosby was not maintaining a proper lookout. There were no cars in the front of, or approaching him and nothing to prevent his having seen John earlier if he had been maintaining even a casual lookout, and had been driving, especially in view of the wet and slippery condition of the street, at the prescribed rate of speed. If he had been on the lookout he could have discovered the peril of John and avoided the accident by either stopping or by continuing to drive in the right traffic lane or, if necessary, onto part of the 6 foot shoulder adjacent thereto; instead, when he did discover the presence of John, he blew his horn and applied his brakes which caused his cab to move into a diagonal skid and, in the course thereof, John was struck by the left front section of the taxicab in the left traffic lane of Eleventh Street.
In his written reasons for judgment, with which we are in full accord, the judge of the court, a qua, said:
"The evidence clearly shows that the decedent was attempting to cross the intersection at a place where he had a lawful right to cross and that before he could negotiate the entire crossing the taxicab driven by one of the defendants, Harold Lee Crosby, ran into decedent as a result of which he died.
"The evidence further shows that the said taxicab did skid for a considerable distance and turn completely around in said street after striking the decedent herein, and that said evidence is clearly contrary to the allegations in the answer of the defendants herein.
* * * * * *
"The Court is of the firm opinion that the said accident was caused through the gross negligence of the defendant, Harold Lee Crosby, driver of said taxicab * * *."
The lower court awarded plaintiff the sum of $4,000 for loss of love, affection and companionship and $458.50 for funeral expenses. The record reveals a stipulation, *408 which the trial judge inadvertently overlooked, to the effect that the funeral bill amounted to $400 as originally prayed for by the plaintiff, therefore, the judgment, in this respect, must be amended.
John was eighty-six years of age and died almost immediately after the unfortunate accident. His surviving spouse was seventy-three years of age. In our consideration of the quantum awarded in this particular case, we are of the opinion that it is adequate.
For the reasons assigned the judgment appealed from is amended by reducing the amount thereof from the sum of $4,458.50 to $4,400 and as thus amended it is affirmed. Defendant to pay all costs.
Amanded and Affirmed.