LOTTINGER, Judge.
This is a tort action arising out of an accident which occurred on March 4, 1949, in the village of Cut Off, in Lafourche Parish, when a Mercury automobile struck and killed one Francis Bágala. The plaintiffs, Joseph J. Bagala, et al., the children of the decedent, seek' to recover the sum of $10,591.72 for the alleged wrongful death of their father averring - that one of the defendants, Clarence J. Kimble, was driving the automobile at the time and that the other defendant, E. W. Gravolet, Jr., was riding , in the car with him on an-alleged joint venture. The petition sets forth that the accident was caused by the negligence of Kim'ble (imputable to Gravolet), as follows :
“(1) Driving said Mercury Automobile while intoxicated or while under the influence of intoxicating liquors or beverages.
“(2) Driving said automobile on the public highway through Cut Off, Louisiana, at an excessive, unreasonable and improper rate of speed and in particular at a rate of speed grossly in excess of the legal rates imposed by the laws of the State of Louisiana.
“(3) Driving said automobile on the public highway in a careless, improper and unreasonable manner with total and utter disregard for vehicular traffic or pedestrians in the location and neighborhood where he was travelling so as to endanger and jeopardize the lives and -property of others.
“(4) Utter failure on. part of the defendant to maintain the proper lookout.
“(5) Failure to maintain his automobile under such control and- speed so as to permit him to stop in time and avoid striking the said Francis Bagala.
“(6) Failure to sound the horn of the Mercury automobile to warn of its approach.
“(7) Violation of the laws of the State of Louisiana which regulate and prescribe the legal speed limits of motor vehicles using the highways of this state and in particular Rule 4, Section 3, subsections a, c(l), of Act 286, 1938, as amended and Section 1 and 4 of Act 502 of 1948.”.
The defendants in their answer denied the allegations of joint venture and negligence and averred that Kimble was driving carefully at a speed of forty to forty-five miles . per hour; when -the decedent suddenly ran from the west, or left side of the road, directly into the path of the automobile. It was further set forth that Kimble immediately applied his brakes in an attempt to avoid striking Bagala, but that it was impossible to do so-. In the alternative contributory negligence was pleaded as a bar to recovery by the plaintiffs. 'After quite'a lengthy trial the trial judge rendered judgment dismissing the plaintiff’s suit, from which judgment they have appealed to this court.
The first act of ncgligence charged against the defendants, is that Kimble was driving the automobile “while intoxicated or while under the influence of intoxicating liquors or beverages”. The record disclosed that both Kimble and Gravolet accompanied by the latter’s wife, had left Pointe a la Hache that morning, arrived in Golden *525 Meadow 'shortly' before' ntíón and rémained in that vicinity until their1 departure that evening.' Taking the record as a whole, it is abundantly clear from the testimony that throughout the entire afternoon Kimble drank very 'little. First, it was testified to by Kimble himself, that he is a very moderate drinker, a statement which was substantiated by the testimony of one Gilbert Duet, an apparently disinterested witness, who was an old acquaintance of Kimble and who tried to buy him a drink ori the afternoon in question which Kimble refused. Second, it is shown that Kimble expected to drive back to Pointe a la Hache and purposely refrained from drinking for that very reason, a fact which was testified to not only by Kimble himself but by several other witnesses as well. With further reference to Kimble’s condition we are impressed by the testimony of Mr. Paul Dufrene, who rode in the automobile with him both prior and subsequent to the accident. According to this witness, Kimble was normal in speech, appearance and demeanor which conclusion he summarized with the statement that “His condition was perfect as far as I’m concerned.” We are further impressed by the fact that two of the plaintiff’s witnesses,. Emile and Paul Lee, who were their neighbors and friends, were on the ■ scene immediately after the accident and neither stated that Kimble was intoxicated. Indeed, one- of these men, Paul Lee, apparently referring to Kimble, stated that he spoke to him regarding contacting the sheriff and that “he spoke well”. Our conclusion, therefore, is that there is nothing in the record to show excessive drinking on the part of Kimble or that anything consumed by him resulted in intoxication and negligence causing the accident.
We shall next consider the second and seventh allegations of negligence, both of which charge that Kimble was driving at an improper and excessive rate of speed. The only witness for the plaintiffs who saw the car before the accident, Rocco Bagala, stated that it was driving at “a very excessive rate of speed” and that “at the time of the impact was at I would say he was hitting about 45 to 50 and'about 45 I would say. after he applied his brakes.”
' Surprisingly enough the above'referred to testimony bf one of the plaintiffs -coincides with that offered by the defendants. Kimble stated that he “was going between forty and fifty miles an hour” and that the decedent was “hit at a speed of forty or forty-five”. Mrs. E. W. Gravolet, Jr., who was'seated next to Kimble testified that they were driving slowly and around forty miles an hour. She stated further that “I feel sure we weren’t going over 40 miles an hour”.
There was some physical evidence as to the speed of the car and examining this, we found that it substantiates to some extent the oral testimony referred to above. Joseph Bagala. testified that the . morning following the accident he'measured the skid marks on the highway.' According, to his testimony, these measured a distance of' 62 feet from their beginning to a point which he identified as being marked by his father’s heels and he stated further that there was an additional distance of 56 feet 3 inches from this point to where the automobile stopped. This would give a total of 119 feet 3 inches. This witness, however, stated that the total distance from the beginning of the skid marks to where the car came to a stop was 181 feet 3 inches. Mr. A., P. Prejean, of the State Police, testified that he had measured skid marks with Mr. Joseph Bagala the; morning.after the accident and that they totalled a distance of 125 feet. Mrs. Gravo-let testified that after the car had been brought to a stop on the highway, it was then turned to the left and parked before any of its occupants descended. In view of the fact that the car was gone in the morning when Mr. Bagala and Mr. Prejean made their measurements and in View of the greater experience of Mr. Prejean in these matters, we must necessarily conclude that any measurements to where the car stopped would not be accurate. Accordingly, therefore, the most reasonable testimony is that of Mr. Prejean to the effect that the actual skid marks themselves were 125 feet in length.
According to the chart found in Blash-field’s Cyclopedia of Automobile Law and Practice, found at Sec. 6237 thereof, the actual stopping distánce of a car travelling 60 miles per hour is 160 feet and that of. a *526 car travelling 50 miles per hour is 111 feet. Having concluded that the skid marks were, 125 feet in length, it necessarily follows that Kimble was driving less than 60 miles an hour and far less than 80 miles per hour as counsel for appellants would have us believe. Consequently, we do not find that his speed was negligence per se and the proximate cause O'f the accident.
We come now to the third and fourth allegations of negligence which aré that Kinrble drove carelessly and improperly and failed to keep a proper lookout. According to both Mrs. Gravolet and a Miss Ouida' Adams, Kimble was travelling in the proper lane. This is substantiated by the-testimony of Mr. Prejean who stated that he found the skid marks “i-n the right traffic-lane going towards Raceland”, which,'of course, was the direction in which- Kimible was driving at the' time. The record is absolutely devoid of any evidence which would indicate the improper driving alleged.
The perhaps most important charge of-negligence is that the defendant Kimble failed to have his car under control. In' this connection it is important to note that all witnesses agree that the accident occurred on a straight stretch of concrete highway 18 feet wide which ran through an unlighted residential district along Bayou Lafourche. Further, it is- agreed that the. weather was clear and dry and that the accident occurred' at dusk.
Kimble’s version of the accident is as follows:
“This particular night it’s late dusk, the business -places don’t seem to have their lights on, the road is perfectly clear, my lights are shining brightly, and all of a sudden in a flash an object is in front of my left front light about six feet. I apply the brakes. I guess I skid. Then, too, this object is . about as high as the radiator. I recognized a man at the moment of impact. When I saw the object it appeared to be something a little above the radiator cap in height, doubled up or running. That man flashed out from the darkness into the front of the car, and there wasn’t a possible chance of «le missing him any kind of way.”
Kimble’s version of the accident is substantiated by Mrs. Gravolet. This lady testified that “he was right on us or we were right on him”. She also stated that “He was, he looked to me like he was little, and he was sort of bent over running”., Further, Mrs. Gravolet said “It was just a. flash. -1 saw a little old man running and we hit him”. “Just a split second and then it happened”.
The only one other person in a position to see the accident was a Miss Ouida Adams, an 18 year old neighbor of the decedent, who testified as follows:
“I was walking along the shoulder of the highway going to the show, and I saw Mr. Bagala standing on the shoulder of the highway in front of the drivewa-y. I thought he was standing watching the cars go by like he did a couple nights before when I saw him. When I saw he wanted to cross the road I saw the car coming. I told him to watch out,'but I guess he didn’t hear me or I didn’t say it loud enough, because he crossed. Just then when it happened a man from the nearby saloon came, and he asked me -what happened, and I told him Mr. Bagala got hit, and a friend of mine came by, and I told her, and we went over to her house and came back home, and then I went to the show.”
This young lady stated that she was only 15 feet from the decedent when she warned him, and that “He couldn’t run very fast but what I saw it looked like he was running”.
It should -be noted in connection with this-young lady’s testimony that while under, -cross examination she indicated she had not seen the actual impact of the decedent and the -car. With reference to the subject of her testimony, we wish to quote from the trial judge, who, in his written reasons for judgment, made the following observation:
■ “It should be noted here that the witness appeared to be nervous the moment she took the stand, that her nervousness increased as her examination progressed, and that it became mote intense as-the cross-examiner attempted to elicit from her an explanation of how she *527 happened to be so near the accident and yet did not actually see the car strike the decedent. It was our impression at the time that she appeared to 'be even more perturbed by the fact that the cross-examiner’s tone indicated a disbelief of her testimony.”
“Despite the seeming discrepancy in her testimony as to her proximity to the accident without her having seen its termination by the impact, we entertained no doubt 'at the time as to her veracity or reliability. As a matter ■ of fact, it was our belief that the witness was a sensitive young woman of such temperament that the frightening thought of the impending calamity unconsciously prompted her to close her eyes or turn her head to avoid the sight of the tragedy. We still so believe. There was no evidence of hostility on her part, nor the slightest indication of any unfriendliness toward the members of the Bagala family, who were her neighbors. It was and is our belief that she told the simple unadorned truth, and in so doing confirmed the testimony of Kimble and Mrs. Gravolet.”
The trial judge also made the following findings which are most pertinent and in which we concur:
“It is worthy of note that according to Sergeant Prejean and Rocco Bagala ‘That is a heavily trafficked area’. The testimony shows that, despite his age of '86 years, the decedent was very active, ‘ his vision good enough to permit him to thread a needle, and that he was thoroughly familiar with the area and particularly the highway, since, according to Joseph Bagala, ‘he crossed that highway better than ten times a day’.
“We find nothing in the record that •gives even the slightest indication that Kimble should or could have anticipated, and have been prepared for, the sudden contingency that arose before him. On the contrary, the decedent, because of his familiarity with the area and traffic on the highway, should have known the risk involved in crossing the highway, and should have made certain that a crossing was safe before attempting it.”
The last act of alleged negligence is the failure of Kimble to sound 'his horn. From the conclusion we have already reached, it is apparent he cannot be charged with the responsibility of sounding his horn before the emergency arose and we are of the. opinion that here again the conclusions of the trial judge are correct in holding as follows: •
“The emergency arose when Francis Bagala entered upon and started across the 18-foot, concrete slab. The testimony is not contradicted that the decedent was running, across the highway. We feel safe in saying that a walking speed of four miles per hour .is a very moderate rate, particularly for a short distance. . Hence, it seems to us to be safe to assume that the decedent, despite his age, should have •been running at a speed of at least six miles per hour for the short distance across the highway. The latter speed is a rate of 8.8 feet per second.
“We shall assume that what are described as the heel.-marks of the decedent’s shoes at the point of impact are in fact his heel marks. They are described as being 62 feet from the point of beginning of the automobile skid marks. The chart heretofore referred to shows the length of an automobile-to be approximately 17 feet. We shall assume the point of traction of the rear wheels to be about 2 feet from the rear end of the car or about 15 feet'from the front of th'e car. On this assumption, the front end of the car was 45 feet from the decedent when the application of the brakes 'became effective.
“We shall further assume the car to have been travelling -at the rate of 55 miles per hour, (although it is our conviction that it was probably travel-ling not faster than 50 miles per hour). That is a travelling speed of 80 feet per second. Hence, there was a lapse *528 of less than.a. second from the applica-. tion.of the brakes to the .time of the impact. Normal reaction time (the distance a car travels between the time the driver sees danger and starts to apply the 'brakes) is three-fourths of a- ' second. Thus, there was a total elapsed time of considerably less than two seconds from the time tile decedent stepped upon the highway to the time' of impact. We believe that at a speed of 50 miles per hour, the total 'elapsed timé was still less' than two seconds. We do not believe there was negligence in not sounding the hofn in that brief span of time or that 'a sounding of the 'horn would have averted the tragic result.” '
The record certainly fails to disclose any manifest error on the part of the trial judge and we agree with him that the proximate' cause of’ the accident was the negligence of the decedent.
Therefore, for the. reasons assigned, the judgment appealed from is affirmed. Judgment affirmed.