HAWTHORNE, dissents from the refusal to grant a rehearing.

MOISE, J., recused.

**74 So.2d 172**

**BAGALA et al.   v.   KIMBLE et al.**

**No. 41183.**

Jan. 11, 1954.

On Rehearing July 2, 1954.

Stanley A. Baron, New Orleans, Frank D. Tournier, Washington, D. C., for plaintiffs-appellants.

Normann & Normann, New Orleans, for defendants-appellees.

MOISE, Justice.

The district court and the Court of Appeal for the First Circuit of Louisiana dismissed the plaintiffs' suit. From the judgment of the Court of Appeal, 62 So.2d 523, writs were applied for and granted by this Court.

The character of this action is one in tort. The claimants are the four children of the deceased, Francis Bagala. The injury sustained was death through accidental means. The damages claimed by the plaintiffs amount to the sum of $10,591.72.

The defendant litigants are Francis J. Kimble and E. W. Gravolet, Jr. The contention is made that these two defendants were on a joint venture. The plaintiffs claim that their father's death was caused through the negligence of the driver of the automobile, and that negligence is imputable to his co-adventurer. The negligence is particularized as follows:

1. Driving while under the influence of intoxicating liquor.

2. Driving at an excessive rate of speed and in particular at a speed in excess of that provided by law. Act 502 of 1948, LSA–R.S. 32:223.

3. Driving in a careless and improper manner.

4. Failing to maintain a proper look-out.

5. Failing to keep the car under control.

6. Failing to sound the horn to warn of approach.

7. Violating statutory speed limits. Act 502 of 1948, LSA–R.S. 32:223.

Issue was joined when the defendants answered denying that there was a joint venture; denying that there was any negligence on the part of the defendant Kimble; affirmatively alleging that defendant Kimble was driving the car prudently and carefully; affirmatively alleging that the accident was caused and occasioned solely by Francis Bagala's suddenly departing from the path of the side of the road into the path of the oncoming automobile; and pleading that at the time of the accident defendant Kimble was faced with a grave emergency and used every effort possible and available to him to avert the accident. Defendants therefore affirmatively averred that the deceased created his own perilous position.[1]

In the alternative, the defendants pleaded contributory negligence.

At the time of argument before this court defendant filed an exception of no legal cause or right of action. There will be no comment on this exception, except to say that it has about the same relation to the merits of this case as the appendix has to the human body—no function to perform. See, Code of Practice, Article 333; Powe v. Morgan's Louisiana & T. R. R. & S. S. Co., 7 La.App. 51; Reisz v. Kansas City Southern R. Co., 148 La. 929, 88 So. 120.

We have carefully read this record, and we conclude that the findings of fact of both the trial court and the Court of Appeal for the First Circuit are correctly stated. We now quote the facts from the district court's reasons for judgment:

"The first act of negligence alleged by plaintiffs is that Kimble was driving 'while intoxicated or while under the influence of intoxicating liquors or beverages.'

"The testimony as to Kimble's drinking is that during the entire afternoon preceding the accident he drank comparatively little. This moderate drinking on the part of Kimble is accounted for in two ways. One is Kimble's statement that he is an habitually moderate drinker, which appears to be confirmed by the testimony of Gilbert Duet (page 175 of transcript), an apparent—

---

1. It was shown that he was running, and that the reason for his running possibly was to try to get across the road in advance of the oncoming car.

ly disinterested witness. The other is that Kimble expected to drive the car from Golden Meadow to Pointe a la Hache, and consequently expressly refrained from excessive drinking, which circumstance is confirmed by several witnesses. In any event, there is no evidence of any excessive drinking on the part of Kimble that can be held to constitute a source of negligence.

"As to the effect of the drinking in which Kimble indulged upon his driving, we have the testimony of Paul Dufrene, who rode in the car with Kimble both immediately before and after the accident. The substance of his testimony is that Kimble was normal in appearance, speech, demeanor and all his actions, all of which he summarized with the statement that 'His condition was perfect as far as I'm concerned.'

"We find no evidence whatever in the record showing that Kimble drank excessively at any time preceding the accident, or that whatever he drank had any effect upon his driving.

"We are impressed, therefore, that not only is there no preponderance of evidence that Kimble's alleged negligence is attributable to his driving while under the influence of intoxicating liquors, but that there is practically no evidence at all.

## "2 and 7

"The second act of alleged negligence is that Kimble was driving 'at an excessive, unreasonable and improper rate of speed and in particular at a rate of speed grossly in excess of the legal rates imposed by the laws of the State of Louisiana;' and the seventh, akin to the second, is that he violated specific statutory speed limits.

"Kimble's testimony is that he 'was going between forty and fifty miles an hour,' that he 'never was driving faster than fifty miles an hour,' and that the decedent 'was hit at a speed of forty or forty-five.' The testimony of Mrs. E. W. Gravolet is that Kimble 'was driving slowly,' that 'we were going around 40 miles an hour,' and that 'I feel sure we weren't going over 40 miles an hour.'

"The only other testimony as to the speed at which the car was being driven is that of Rocco Bagala, who testified that the car was travelling at a 'very excessive rate of speed,' and that 'at the time of impact was at I would say he was hitting about 45 to 50,' 'about 45 I would say after he applied his brakes.' The last statement very nearly parallels and confirms that of Kimble, and does not impress us as establishing the 'very excessive rate of speed' that this witness mentioned.

"However, there is evidence in the record that provides a basis for calculating approximately the *potential maximum speed* at which Kimble was driving. We shall examine the testimony most favorable to plaintiffs, that of Joseph Bagala. He testified that there were skid marks measuring a length of 125 feet, and a distance of either 53' 3" or 56' 3" from the end of the skid marks to the front bumper of the car where

it came to a *stop* after the accident. He mentioned a total distance of 181′ 3″, although, according to his figures, it might have been 178′ 3″. Incidently, there is no explanation as to how he fixed the position of the front bumper of the Kimble car after it came to a stop, since no measurements were made at the time of the accident, and the following morning when the measurements were made there was no car. Nevertheless, we shall accept 180 feet as the braking distance for the purpose of our calculations.

"Reference to a chart entitled 'Automobile Stopping Distance For Different Road Conditions,' prepared by the Research Laboratories Division of General Motors Corporation, shows that the shortest stopping distance on dry concrete of an automobile travelling 60 miles per hour is 197 feet. It is obvious, therefore, that the Kimble car must have been travelling at a rate of speed *less* than sixty (60) miles per hour. Without the benefit of a proven scale showing stopping distances at intermediate speeds, we shall arbitrarily assume a *potential maximum speed* of approximately 57 miles per hour.

"The testimony of Mrs. Gravolet elicited under Cross-examination is that immediately after the accident the car, after travelling straight ahead, was brought to a stop on the highway, and that then the car was turned left off the highway and parked before any of its occupants descended from it. Since no note was taken of the actual

stopping point of the car on the highway on the evening of the accident, and a measurement from its actual stopping point on the highway was an utter impossibility after it was moved to the side of the highway and parked, we can only assume that the testimony of Joseph Bagala as to the distance of 53′ or 56′ 3″ from the end of the skid marks to the bumper of the car, where, in the words of the questioner, it 'eventually stopped' or 'finally stopped,' necessarily refers to the distance from the end of the skid marks to the bumper of the car where it was *parked*. Without question this distance must necessarily be greater than the distance from the end of the skid marks to the point where the car *actually* stopped on the highway, which latter point would mark the *actual braking distance* Consequently, we must conclude that the actual braking distance was less than 180 feet and that the *probable maximum speed* was *less* than 57 miles per hour.

"Hence, we do not find that the speed at which Kimble was driving was per se negligent or in violation of law."

See Great American Ins. Co. v. New Amsterdam Casualty Co. (New Amsterdam Casualty Co. v. Great American Indemnity Co.), La.App., 15 So.2d 241; Federal Ins. Co. v. Employers' Liability Ins. Corp., La. App., 4 So.2d 626; Grasser v. Cunningham, La.App., 200 So. 658; Michelli v. Rheem Mfg. Co., La.App., 34 So.2d 264; Picou v. J. B. Luke's Sons, 204 La. 881, 16 So.2d 466.

## "3 and 4

"The third and fourth alleged acts of negligence are that Kimble was: Driving in a careless, improper and unreasonable manner and in utter disregard for vehicular traffic and pedestrians; and Failing to maintain a proper lookout.

"In addition to the testimony heretofore referred to, there is other evidence in the record as to two factual circumstances indicating the manner in which Kimble was driving. One of these is disclosed by Kimble and Mrs. Gravolet to the effect that, after leaving Golden Meadow to drive home and immediately before the accident occurred, Kimble slowed down and stopped the car near a church, toward which vehicular traffic was turning from the main highway for the evident purpose of attendance at evening services by their occupants.

"The other is revealed by Mrs. Gravolet, a passenger in the car, Sergeant Prejeant of the State Police and Ouida Adams, a neighbor of the Bagala family. Mrs. Gravolet testified that 'Mr. Kimble was driving on the right hand side of the highway,' while Ouida Adams stated that 'He was coming in the proper lane he should have been in.' Their testimony is confirmed by Sergeant Prejeant, who testified that the skid marks of the Kimble car at the place where the accident occurred 'were in the right traffic lane going towards Raceland,' that being the same lane referred to by the other witnesses.

"It is our finding, therefore, that there is no evidence sustaining the allegations of negligence mentioned hereinabove.

## "5

"The fifth alleged act of negligence is that Kimble failed to maintain his car under proper control.

"It seems to us that this allegation relates specifically and directly to the accident. The record discloses the facts and circumstances hereinafter set forth.

"The testimony of Sergeant Prejeant is confirmed by other witnesses that the accident occurred on a straight stretch of highway paved with concrete, traversing an unlighted residential area, on a clear, dry evening. The concrete slab is eighteen feet wide. All of the witnesses agree that the time was at dusk.

"This is Kimble's description of the accident:

" 'This particular night its late dusk, the business places don't seem to have their lights on, the road is perfectly clear, my lights are shining brightly, and all of a sudden in a flash an object is in front of my left front light about six feet. I apply the brakes. I guess I skid. Then, too, this object is about as high as the radiator. I recognized a man at the moment of impact. When I saw the object it appeared to be something a little above the radiator cap in height, doubled up and running. That man flashed out from the darkness into the

front of the car, and there wasn't a possible chance of me missing him any kind of way.'

"Mrs. Gravolet tells substantially the same story. 'He was right on us or we were right on him.' 'He was, he looked to me like he was little, and he was sort of bent over running.' 'It was just a flash. I saw a little old man running, and we hit him.' 'Just a split second and then it happened.'

"Their testimony is confirmed by that of Ouida Adams, an 18 year old graduate of Cut Off High School, a neighbor of the decedent Francis Bagala, and unquestionably a disinterested witness. She testified:

" 'I was walking along the shoulder of the highway going to the show, and I saw Mr. Bagala standing on the shoulder of the highway in front of the driveway. I thought he was standing watching the cars go by like he did a couple nights before when I saw him. When I saw he wanted to cross the road I saw the car coming. I told him to watch out, but I guess he didn't hear me or I didn't say it loud enough, because he crossed. Just then when it happened a man from the nearby saloon came, and he asked me what happened, and I told him Mr. Bagala got hit, and a friend of mine came by, and I told her, and we went over to her house and came back home, and then I went to the show.'

"She was about 15 feet away from the decedent when she told him to watch out. 'He couldn't run very fast, but what I saw it looked like he was running.'

"During her cross-examination, when her testimony indicated she had not seen the actual impact of the decedent against the car, she was asked: 'How do you know Mr. Bagala was hit by that automobile?' And she answered: 'Because I saw the car coming, and the old man ran across, and I guess its that car that must have hit him since no other car was coming.'

"It should be noted here that the witness appeared to be nervous the moment she took the stand, that her nervousness increased as her examination progressed, and that it became more intense as the cross-examiner attempted to elicit from her an explanation of how she happened to be so near the accident and yet did not actually see the car strike the decedent. It was our impression at the time that she appeared to be even more perturbed by the fact that the cross-examiner's tone indicated a disbelief of her testimony.

"Despite the seeming discrepancy in her testimony as to her proximity to the accident without her having seen its termination by the impact, we entertained no doubt at the time as to her veracity or reliability. As a matter of fact, it was our belief that the witness was a sensitive young woman of such temperament that the frightening thought of the impending calamity unconsciously prompted her to close her eyes or turn her head to avoid the sight of the tragedy. We still so believe. There was

no evidence of hostility on her part, nor the slightest indication of any unfriendliness toward the members of the Bagala family, who were neighbors. It was and is our belief that she told the simple unadorned truth, and in so doing confirmed the testimony of Kimble and Mrs. Gravolet.

"It is worthy of note that according to Sergeant Prejeant and Rocco Bagala 'That is a heavily trafficked area.' The testimony shows that, despite his age of 86 years the decedent was very active, his vision good enough to permit him to thread a needle, and that he was thoroughly familiar with the area and particularly the highway, since, according to Joseph Bagala 'he crossed that highway better than ten times a day.'

"We find nothing in the record that gives even the slightest indication that Kimble should or could have anticipated, and have been prepared for, the sudden contingency that arose before him. On the contrary, the decedent, because of his familiarity with the area and traffic on the highway, should have known the risk involved in crossing the highway, and should have made certain that a crossing was safe before attempting it.

"6

"The last act of alleged negligence is that Kimble failed to sound the horn to warn of his approach.

"In view of the circumstances set forth hereinabove, we cannot charge Kimble with the responsibility of sounding his horn before the emergency arose, and we entertain serious doubts whether after the emergency had arisen there was time for him to sound it, or whether his having sounded it thereafter would have served any purpose.

"The emergency arose when Francis Bagala entered upon and started across the 18-foot concrete slab. The testimony is not contradicted that the decedent was running across the highway. We feel safe in saying that a walking speed of four miles per hour is a very moderate rate, particularly for a short distance. Hence, it seems to us to be safe to assume that the decedent, despite his age, should have been running at a speed of at least six miles per hour for the short distance across the highway. The latter speed is a rate of 8.8 feet per second.

. "We shall assume that what are described as the heel marks of the decedent's shoes at the point of impact are in fact his heel marks. They are described as being 62 feet from the point of beginning of the automobile skid marks. The chart heretofore referred to shows the length of an automobile to be approximately 17 feet. We shall assume the point of traction of the rear wheels to be about 2 feet from the rear end of the car or about 15 feet from the front of the car. On this assumption, the front end of the car was 45 feet from the decedent when the application of the brakes became effective.

"We shall further assume the car to have been travelling at the rate of 55 miles per

hour, (although it is our conviction that it was probably travelling not faster than 50 miles per hour). That is a travelling speed of 80 feet per second. Hence, there was a lapse of less than a second from the application of the brakes to the time of the impact. Normal reaction time (the distance a car travels between the time the driver sees danger and starts to apply the brakes) is three-fourths of a second. Thus, there was a total elapsed time of considerably less than two seconds from the time the decedent stepped upon the highway to the time of impact. We believe that at a speed of 50 miles per hour, the total elapsed time was still less than two seconds. We do not believe there was negligence in not sounding the horn in that brief span of time or that a sounding of the horn would have averted the tragic result." See, De La Vergne v. Employers Liability Assur. Corp., La.App., 4 So.2d 66; Sonnier v. Broussard, La.App., 44 So.2d 339.

■ The reading of the record clearly demonstrates that Kimble was faced with a sudden emergency, and when he discovered the peril in which the deceased had placed himself by trying to get across the road, it was too late for the driver to avoid the accident. The alleged co-adventurer and owner of the car, E. W. Gravolet, Jr., was asleep on the back seat of the car. Plaintiffs have failed to show that the accident might have been avoided by the exercise of ordinary care on the part of the driver after the danger was discovered by him.

Therefore, plaintiffs are not entitled to recover. Tyer v. Gulf, C. & S. R. Co., 143 La. 177, 78 So. 438; Guinn v. Kemp, 18 La.App. 3, 136 So. 764; Brady v. Whitehead, La.App., 55 So.2d 269; Wayne v. New Orleans Public Service, La.App., 52 So.2d 55.

■ Plaintiffs invoke the doctrine of last clear chance. In the suit of Bergeron v. Dept. of Highways, 221 La. 595, 60 So.2d 4, 8, an exhaustive review was made relating to the jurisprudence applicable to that doctrine, and we are of the opinion that what we said there is appropriate here:

"The rule of 'the last clear chance' or 'discovered peril' applies to both parties who are involved in an accident. In 38 Am.Jur. Negligence, Sec. 227, that thought is expressed as follows: 'As graphically stated by some authorities, the doctrine of discovered peril is a two-edged sword, applicable equally to the rights of a defendant and those of a plaintiff.' Under the facts of this case it was the bicycle rider who had the better opportunity to observe the situation and apprehend the danger before it became imminent. His opportunity came as late, if not later than that of the truck driver, to avoid the accident; he had the last clear chance and is not in a position to invoke its provisions against the defendants."

The deceased was contributorily negligent. Such negligence precludes plaintiffs' recovering damages.

"It is fundamental that one who relies on the doctrine of last clear chance in effect admits his own negligence, but charges that the other party could, nevertheless, have avoided the accident." Burns v. Evans Cooperage Co., Inc., 208 La. 406, 23 So.2d 165, 166. See, Bridges v. Werner, La.App., 152 So. 401.

"The Trial Court as well as the Court of Appeal was of the opinion that, irrespective of which driver was entitled to the right of way, the drivers of both cars were negligent. Our appreciation of the testimony leads us to the same conclusion. The jurisprudence of this State is well settled that neither of two parties, both of whom were at fault, can recover damages for injuries caused by the other's negligence. * * *" Burden v. Capitol Stores, 200 La. 329, 8 So.2d 45, 46.

This Court concludes as did the trial court and the Court of Appeal, First Circuit of Louisiana, that the proximate cause of the accident was the deceased's suddenly shooting out from the pavement and running across the highway in front of the oncoming car. Such action constituted contributory negligence.

For the reasons assigned, the judgment of the Court of Appeal for the First Circuit and that of the Seventeenth Judicial District Court for the Parish of Lafourche, dismissing plaintiffs' suit and denying their demands, are affirmed at plaintiffs' cost.

HAMITER, J., dissents with written reasons.

HAWTHORNE, J., concurs in the decree.

HAMITER, Justice (dissenting).

The accident involved in this cause occurred, as the opinion of the Court of Appeal states, within the Village of Cut Off, in Lafourche Parish. The automobile, momentarily prior to the striking of decedent, was traveling much in excess of 50 miles per hour (it skidded 125 feet after the brakes were applied), a speed which, under the circumstances, was imprudent, unreasonable, improper and prohibited by law. Rule IV of Act 286 of 1938 and Act 502 of 1948, LSA–R.S. 32:223 et seq. · The driver, therefore, was guilty of negligence.

Moreover, such negligence, I think, was the sole cause of the accident and death. A view of decedent, while he was crossing the thoroughfare, was unobstructed; and had the car been operated at a careful and prudent speed he could and would have been detected in ample time for an avoidance of the unfortunate mishap. Also, he was in no manner negligent. When entering the street the vehicle was at least two hundred feet away; and he, even if he observed its approach, had the right to assume that it was proceeding at the reasonable and safe speed demanded by law in that populous area.

I respectfully dissent.

### On Rehearing

LE BLANC, Justice.

The issues presented in this case have been fully stated in the original opinion, the same as they had been stated in the opinion of the trial judge and that of the Court of Appeal for the First Circuit. In the original opinion it is stated that "we have carefully read this record, and we conclude that the findings of fact of both the trial court and the Court of Appeal for the First Circuit are correctly stated." We agreed with those findings and concluded, as both those Courts had, "that the proximate cause of the accident was the deceased's suddenly shooting out from the pavement and running across the highway in front of the oncoming car" and that such action on his part "constituted contributory negligence." Notwithstanding this conclusion a rehearing was granted to give further consideration to the case. This we have done and after having carefully reread the testimony, remain convinced that our former decision is correct.

We were influenced in granting the rehearing by the urgent appeal of counsel to reconsider the testimony relating to the excessive speed of the car which caused the accident, as reflected by the skid marks and the imprint of certain alleged heel-marks found on the paved surface of the highway on the following morning. Another contention that had previousy been made with regard to the violation of the statutory limit of twenty-five miles per hour in travelling through unincorporated villages was also strenuously pressed again.

With regard to this last point reference is made in counsel's brief to the fact that several witnesses stated that the accident happened "in Cut-Off" and that both the District Court and the Court of Appeal found that the accident happened "within the village of Cut-Off in Lafourche Parish." We have again carefully examined the written reasons of the trial judge and find no mention by him as to the locality of the accident being a village. Whilst it is true that mention is made by the Court of Appeal that it occurred in the "village of Cut-Off" we find that expression in the very beginning of the opinion in a general statement concerning the nature of the suit. There is nothing in the record to indicate that the locus of the accident was in a village or in an unincorporated village. The report of the investigating State Highway officer would indicate otherwise for in it he refers to the locality as "residential district—there being a few houses and a couple of stores at that point *around Cut-Off*." The "village" of Cut-Off, we would think, would be, according to the record, at a point further south where there is a Church, a moving picture theatre and also a barroom.

We do not think therefore that we would be justified in holding that the accident occurred within the limits of an unincorporated village where the twenty-five mile

speed limit prevails, LSA–R.S. 32:223, and to hold the driver of the car guilty of the violation of any other regulation we have to look to the general provision of the statute, LSA–R.S. 32:227, which prescribes that "In addition to the specific speed limitations of this Chapter, no person shall operate any vehicle upon the highways of this state at other than a reasonable and proper speed under the circumstances, or at a speed endangering the persons or property of others." LSA–R.S. 32:223 which fixes the maximum speed of a motor vehicle within any town or unincorporated village at twenty-five miles per hour also fixes the maximum speed of such vehicle upon the highways of the State outside of any town or village not incorporated, at sixty miles per hour.

Besides the surmise of counsel for plaintiffs that the defendant car may have been travelling at a speed in excess of seventy miles there is no testimony nor is there anything else in the record to show that his speed ever reached the maximum of sixty miles per hour, and to hold that he was guilty of reckless driving under that provision of the statute we would have to hold that that wasn't "a reasonable and proper speed under the circumstances". From the record, as presented, we cannot see what circumstances existed at the moment to make a speed of less than sixty miles unreasonable and improper. There was no other traffic on the highway at the moment, the night was clear, the car lights properly illuminated the highway, the highway ran straight and its surface was dry and contained no defects.

The excessive speed and reckless driving relied on by plaintiffs is based entirely on the skid marks which appeared on the highway on the morning following the accident. These, according to the State Police officer's report, extended a distance of one hundred and twenty-five feet from the point where the brakes of the automobile must have been applied. Counsel for plaintiffs fix the point from where the brakes actually were applied to the point of impact as being sixty-two feet, according to the skid marks. They contend however that by allowing time for the normal reaction of the driver and the application of the brakes, the distance was greater than this and by a method of calculation which they employed, they point out that the speed of the car was in excess of seventy miles per hour. Such speed, it is contended, made it impossible for the driver to control the car before reaching the deceased who in the meantime must have been seen by him as he came upon the paved portion of the highway.

In connection with this contention it occurs to us in the first place that the immediate place of the impact is not so well established as counsel say it is. They establish it by reference to certain marks on the highway which they say are the heel-marks of the shoes worn by their deceased father. These, identified by them as smudges, were discovered on the morning following the

accident when they also observed the skid marks and yet, although they carefully pointed out the skid marks and gave other information to the investigating officer on that morning, apparently they did not call his attention to any smudges and if he observed anything like them he did not consider them of any importance since he makes no mention of them either in his report or in his testimony.

The calculations made by counsel are based on certain other assumptions and involve split seconds or fractions of seconds, all of which make them rather speculative in character. But even though it be conceded that all of these things point to some negligence on the part of the driver of the car, it is impossible to overlook the negligence of the deceased which, if not the proximate cause of, very definitely contributed to this unfortunate accident. His negligence, of course, consisted in his having left a place of safety as he stood on the shoulder of the highway and suddenly venturing on the paved portion to go across in the face of the oncoming car which he was bound to have seen had he been the least bit observant.

As pointed out in the written opinion of the trial judge which received the approval of the Court of Appeal and of this Court, the testimony of Kimble, the driver of the car and of Mrs. Gravolet who occupied the front seat, which is to the effect that they were almost on the deceased when they saw him dart from the darkness on to the highway is confirmed by that of the only other witness who was present. This was the fifteen year old girl, Ouida Adams, whose testimony is discussed at length in the opinion of the district judge, part of which is reproduced in the original opinion of this Court. This young lady readily apprehended the danger which confronted the deceased for she called to him to "watch out" when she realized that he wanted to cross the road. If he heard her, he did not heed the warning. Assuming that he did not, it is obvious that he had the same opportunity of sensing and realizing the situation that she had and why, in face of the apparent peril he started across the highway at that moment is a question that is left unanswered by the record in the case. His doing so constituted such negligence on his part as to bar the plaintiffs from recovering damages on account of his resulting death.

The original opinion disposes of the contentions made relative to the rule of "the last clear chance" which had been invoked on behalf of the plaintiffs.

For the reasons stated our former judgment and decree are now reinstated and made final.

FOURNET, C. J., dissents for the reasons this day assigned.

PONDER, J., dissents.

HAMITER, J., dissents with written reasons.

FOURNET, Chief Justice (dissenting).

The majority opinion properly points out that we were influenced in granting a rehearing by the urgent appeal of counsel to reconsider the testimony relating to the excessive speed of the car, which caused the accident, and, too, the fact that in all three opinions—that of the district court, the Court of Appeal, and the original opinion in this court—the provisions of the state law applicable to the speed of automobiles driven through unincorporated villages was ignored.

In the majority opinion it is said that "There is nothing in the record to indicate that the locus of the accident was in a village or in an unincorporated village", and the conclusion is reached that we would not, therefore, "be justified in holding that the accident occurred within the limits of an unincorporated village where the twenty-five mile speed limit prevails". Section 32:-227 of the 1950 revision is cited.

The author of the majority opinion obviously overlooks that these facts were specifically pleaded and admitted by the defendant.[1]

Under the express provisions of the law in effect at the time this accident occurred in 1949, it was "unlawful for any person to operate or drive any passenger motor or other vehicle upon the public roads, highways and bridges of this State * * * at a greater speed than twenty-five (25) miles per hour within or through any town or village not incorporated", Act 502 of 1948, and any person "so driving * * * shall be held and deemed to be prima facie at fault in and responsible for any accident or damage proximately flowing therefrom or connected therewith * * *." Act 286 of 1938, LSA–R.S. 32:1 et seq.

This law was obviously adopted to protect people living in small villages that are usually without proper police protection and traffic control from the excessive and unwarranted speed of motorists using their highways, and the plaintiffs are entitled to have their day in court with due consideration given to these admitted facts in the light of this law.

1. The petition contains the allegation "That on or about 6:30 p. m., on the 4th day of March, 1949, a 1949 Mercury automobile was being driven by the defendant, Clarence J. Kimble, in a northerly direction on the west side of Bayou Lafourche, along Louisiana State Highway Number 78, *in Cut Off*, Parish of Lafourche, Louisiana," (Paragraph 3), and "That Cut Off, Louisiana, is unincorporated and that under the laws of the State of Louisiana the legal speed limits for vehicles travelling in or through said Cut Off, Louisiana, was, and is no greater than twenty-five (25) miles per hour." Paragraph 15. In his answer the defendant specifically admits the allegations of Paragraph 3, while those of Paragraph 15 are denied for lack of sufficient information to establish their belief. (Emphasis supplied.)

In any event, it is my opinion that the proximate cause of the accident was the excessive and heedless speed of the motorist who drove recklessly through this thickly populated unincorporated village, just at dusk, when it was impossible for the decedent to determine at what speed the car was approaching, and this decedent was well within his right in crossing this roadway to rely on the state speed law adopted for his protection.

According to my mathematical calculations, based on the physical facts as disclosed in the record, the driver of the defendant car was travelling nearly 70 miles an hour, as alleged in the petition, and *that* speed is in violation of all of the state laws governing the speed on any and all highways throughout the state.

I therefore respectfully dissent.

HAMITER, Justice (dissenting).

HAMITER, Justice, in dissenting, adheres to the written reasons assigned by him on the original hearing, he being still of the opinion that the unfortunate accident occurred within the Village of Cut Off (according to his appreciation of the evidence in the record), that it was proximately caused by the negligent operation of the motor vehicle, and that the decedent was guilty of no contributory negligence.