BARNETTE, Judge.
The plaintiff E. Carlton Guillot, Jr., individually and as natural tutor for and on behalf of his minor son E. Carlton Guillot III, brought this suit against several named defendants seeking recovery of hospital and other expenses on his own account and damages for personal injuries on behalf of his minor son as the result of the minor’s having been struck by an automobile while crossing Canal Boulevard in the City of New Orleans. From a judgment in favor of the plaintiff individually for $4,000 and on behalf of his minor son for $8,000, the defendants Bernard J. Bagert and Hardware Dealers Mutual Fire Insurance Company have appealed. The plaintiff answered the appeal in this court seeking an increase in the judgment on behalf of his minor son.
The minor plaintiff, a fourteen-year-old boy, sustained multiple and serious injuries when struck by an automobile owned by John M. Flynn, Jr., but with his consent driven by Barbara Bagert, minor daughter of Bernard J. Bagert. Named as defendants in the suit were Bagert, Flynn, and their insurers, Hardware Dealers Mutual Fire Insurance Company, Fidelity General Insurance Company, and Liberty Universal Insurance Company. The case was' tried by jury; and in conformance with its verdict, a judgment was rendered in favor of E. Carlton Guillot, Jr., individually and on behalf of his minor son against Bagert and Hardware Dealers, in solido. The other named defendants were dismissed. The judgment also fixed and awarded expert witness fees taxed as costs.
The accident in which the minor plaintiff was seriously injured occurred shortly after noon on May 31, 1967 at the intersection of Canal Boulevard and Robert E. Lee Boulevard. This is a major intersection in the City of New Orleans controlled by traffic lights.
Canal Boulevard runs approximately north and south to and from Lake Pontchartrain. The neutral ground separating the north-bound and south-bound traffic lanes is 100 feet wide. The south-bound traffic roadway is 30 feet, 4 inches wide; sufficient for two lanes of south-bound traffic and one parking lane. Robert E. Lee Boulevard runs approximately east and west with the traffic lanes separated by a 21-foot neutral ground.
At the northwest corner of this major intersection is a recessed or protected parking apron 8 feet and 6 inches wide for Public Service motor busses on Canal Boulevard. At the time in question a bus was parked in the protected area facing south.
The Guillot youth and other school children disembarked from a west-bound motor bus at a bus stop on Robert E. Lee Boulevard at a point some distance before the bus entered the intersection of Canal Boulevard. Other students stayed on that bus until it crossed Canal Boulevard and made a left turn in the south-bound lanes of Canal Boulevard to another bus stop at the southwest corner of the intersection. This is a transfer point for bus passengers and some of the youths who disembarked at the first stop and some who disembarked at the second stop were attempting to board the waiting bus at the northwest corner of the intersection. This required the Guillot youth to cross both the north and south traffic lanes and the 100-foot neutral ground of Canal Boulevard to reach the waiting bus. He was rushing to make the connection and when he had crossed the neutral ground and reached the south-bound roadway of Canal Boulevard, he ran into the street toward the waiting bus. He was struck at a point at or just beyond the center of the south-bound traffic lanes of Canal Boulevard by an automobile driven by Barbara Bagert.
Riding in the same small foreign made automobile with Miss Bagert were Diana Flynn, whose father, John M. Flynn, Jr., owned the automobile, and Ella Burnett— *361 all teen-age young ladies. There is no issue over the consent of Diana Flynn for her friend Barbara to drive her father’s automobile. These three young ladies and one other, Adrian Beerman, also a student, and the driver of the waiting bus were the only witnesses who testified as to how the accident happened. The Guillot youth, plaintiff, did not testify at the trial. This circumstance will be discussed below. From the testimony of these witnesses the following material facts are established:
Miss Bagert was driving a Karman-Ghia (Volkswagen) automobile south on Canal Boulevard in the left, or neutral ground, lane at about 35 miles per hour, within the lawful speed limit. As she approached Robert E. Lee Boulevard there was a favorable traffic light giving her the right-of-way. When she reached a point near the rear of the waiting bus the plaintiff young Guillot ran into the street from the neutral ground toward the waiting bus. Miss Bagert swerved to her right in an attempt to go between Guillot and the bus, hut the boy did not check his motion. She was then fearful of hitting the bus and made a quick turn back to the left hoping to pass behind him. The right front corner of the car struck Guillot at a point a little more than half way from the neutral ground to the bus. The youth was hurled up onto the front of the car shattering the windshield and was carried a few feet into Robert E. Lee Boulevard where he fell onto the pavement. The brakes were not applied until after the impact and the car proceeded about 144 feet, according to the investigating police officer’s testimony, before it came to rest on the neutral ground. There were no skid marks and no evidence that the automobile ran over the boy.
The bus driver, Ray Alan Fellows, testified that he saw the approaching automobile in his rearview mirror at a point “two or three car lengths behind the bus” and said: “Then I noticed the boy coming across the street. He was running.” He did not see the Guillot youth approaching the street across the neutral ground but first noticed him about as he entered the street running toward the bus against a red traffic light. He fixed the point of impact at a little more than half way across the pavement.
Adrian Beerman, who disembarked from the bus at the second stop, was crossing Robert E. Lee Boulevard from one bus to the other on a green light and saw the accident. She testified that the Guillot youth was “walking” toward the bus when she first noticed him “in the center of the neutral ground.” She said the bus was about to leave and they (meaning herself and others) were rushing toward it. She said the next thing she noticed about the boy was that “he was hit.” She said he was going against the traffic light. To the question “Did you see the car that struck him?” she replied: “No. Not until [s]he [sic] hit him.” She also testified:
“Q Between the point in the center of the neutral ground of Canal Boulevard where you last saw Corky Guillot —
“A Yes..
“Q And the point where he was hit, you did not see what went on?
“A No.
“Q He was running the last time you saw him?
“A At a fast pace. Very fast walk.
“Q A very fast walk ?
“A Yes.
“Q He was not running ?
“A No. Not when I first saw him.
“Q The last time you saw him, before he was hit, he was not running?
“A Well, not running; a very fast pace walk.
“Q But, definitely walking and not running?
“A Definitely.”
*362 Barbara Bagert, driver of the automobile, was called as plaintiff’s witness. She testified to a speed of 30 to 35 miles per hour. As she approached the intersection she saw young Guillot “within that block.” She said: “He was running across the street * * * from my left to my right.” She was pressed for estimates of distance but could give none and finally said her car was “approximately” even with the rear of the bus when she first saw him “in the street.” She gave the following testimony:
“Q What was he doing when you saw him at this time ?
“A Running across the street.
“Q Had you seen him prior to this first instance ?
“A No. I hadn’t.

“Q When you first saw him, what was the first thing you did ?
“A I moved into the right hand lane in order to avoid him.
“Q You moved. How do you mean you moved ?
“A I swerved the car.
“Q What then? What was the next thing that you did?
“A Then, realizing that he wasn’t going to stop running, and he was still running into my path, I swerved back into the right — left hand lane.
“Q You swerved back into the left hand lane?
“A Yes.
“Q What happened next ?
"A As I was swerving, I caught the boy on the right hand side of the car.
“Q Why did you make the change from left to right?
“A Well, at the time, I felt — well, let me see. I feel — I think he looked at me. I’m not positive about it, but at that time, I thought he had looked at me and he would be stopping there. Just, you know, in the path of the car, and I was thinking to go around him so I wouldn’t hit him at all. When I realized I couldn’t go around him, that he was still running in my path I swerved back to try to miss him again.
“Q The entire time you had him in your view, did he ever stop or slow down, or did he maintain his pace of running?
“A I don’t know. It happened too quick. I couldn’t say.
“Q You don’t know whether he stopped or slowed down at all ?
“A I couldn’t say really.”
She did not sound the horn or apply brakes until after impact. She said she intentionally drove the car up on the neutral ground to get it out of traffic.
Diana Flynn, a rear seat passenger in the automobile, was not aware of the Guil-lot boy’s presence at or near the intersection until Miss Bagert turned to the right. The suddenness of the turn alerted her and she then saw him. She stated that they were “very close to him” and “he was running.” Her account of the movement of the car and its position with reference to the bus was substantially as given by Miss Bagert. Like all other witnesses she said the boy ran against the red traffic signal.
The other passenger in the car, Ella Burnett, riding on the front seat, testified that the boy was “standing” at their left “on the neutral ground” when she first saw him. At that time they were about three car lengths (she specified Karman-Ghia car lengths) from the parked bus. She said:
“Q In relation to that bus, if you can remember, where was your automo *363 bile at the time you first saw the boy?
“A Right — the front of the car was at the beginning of the bus lane, which would be right at the back of the bus.
“Q Somewhere to the rear of the bus?
“A It was in back of the bus, give or take a few feet from the beginning of the bus lane.
“Q What did the boy next do ?
“A Well, the boy was standing on the corner, getting ready to cross the street, because they had people getting on the bus and when we first —when I first saw him, we were coming, you know, right even with like the back of the bus and the little boy started running across the street.”
Her account of the movement of the car after that was substantially as given by the other witnesses. On further questioning she said there was a group of children rushing across the neutral ground, but that her notice of Guillot as an individual apart from the group was when he “momentarily” “paused” at the curb before entering the street and that he appeared to look toward the oncoming car.
The other witnesses on this phase of the case were the investigating police officer to whom we have already alluded and John Exnicios, traffic engineer of the City of New Orleans, who identified a chart drawn to scale showing the relevant portion of the intersection. It was from this chart that the street measurements given above were obtained. Mr. Exnicios gave expert testimony on stopping distance at given speeds under normal conditions. His estimate of distance of 94 feet was based upon the length of the parked bus (40 feet) and its position (about 4 feet) back from an imaginary line for the pedestrian crossing and the assumption that the automobile was two and a half car lengths (estimated at 20 feet each) from the bus. At 30 miles per hour, allowing for reaction time after discovery of the emergency, he testified a distance of 79 feet would be required for stopping; at 35 miles per hour, 101 feet. If the car was on a line approximately even with the rear of the bus, as testified to by Miss Bagert and Miss Flynn, he said there was not sufficient distance to stop before entering the intersection.
We have given a complete account of all pertinent testimony in the record relative to how the accident occurred, since the plaintiff does not deny that the boy ran into the street in violation of a traffic light and relies primarily, if not entirely, on the application of the last clear chance doctrine.
It is significant, we think, that the injured youth, who was about sixteen years old at the time of the trial below, was not called as a witness. The record does not reveal if he was present at the trial. There was no explanation of his failure to testify except such as may be drawn inferentially from his father’s testimony, as follows :
“Q Was there any evidence to you that he had suffered a memory loss?
“A Well, yes. I wanted to ask him about the accident. He had no recollection of the accident.
“Q Did he have any recollection of . events immediately prior to the accident ?
“A Very little. Very little.”
The competence of the young man as a witness and the weight to be given to his testimony are matters for determination of the court and jury when properly presented. The foregoing testimony of his father, in the absence of medical testimony, falls far short of explaining his failure to take the witness stand in support of his allegations. From this circumstance there follows the presumption that had he *364 testified his testimony would not have been favorable to his case. Perez v. Meraux, 201 La. 498, 9 So.2d 662 (1942); Centanni v. Centanni, 182 La. 632, 162 So. 203 (1935); Mitchell v. Insurance Co. of North America, 178 So.2d 331 (La.App. 4th Cir.1965); Veillon v. Sylvester, 174 So.2d 189 (La.App. 3d Cir.1965); Mullins v. Seals, 103 So.2d 582 (La.App.Orleans 1958).
Another circumstance to be considered is that the plaintiff having called Miss Bagert, the driver of the offending automobile, thereby vouches for the veracity of her testimony. Hanover Insurance Co. v. Orgeron, 206 So.2d 814 (La.App. 4th Cir.1968); Biaggini v. Toye Bros. Yellow Cab Co., 163 So. 780 (La.App.Orleans 1935).
Unquestionably the plaintiff youth was negligent in running into the street in violation of the traffic signal into the path of the oncoming car. This fact is conceded by the plaintiff because in his petition he alleged that the “proximate” and “immediate cause of the accident” was the failure of Miss Bagert to exercise the last clear chance to avoid the accident. Since he relies solely on the doctrine of last clear chance as his ground for recovery, he in effect admits his own negligence. See Bagala v. Kimble, 225 La. 943, 74 So.2d 172 (1954); Burnett v. Marchand, 186 So.2d 383 (La.App. 1st Cir.1966); Accardo v. Grain Dealers Mutual Insurance Co., 151 So.2d 116 (La.App. 1st Cir.1963); Dean v. Pitts, 133 So.2d 917 (La.App. 2d Cir.1961).
It has been argued that the court should not disturb the jury’s finding of fact in the absence of a showing of manifest error. We do not believe that the 9 to 3 verdict of the jury can be interpreted as a finding of fact that the Guillot boy was not negligent. If so it was manifest error. The jury, being judges of the law as well as the fact, had obvious difficulty understanding the last clear chance doctrine and its applicability to the facts in this case. The jury’s confusion in this respect is revealed by its return for clarification of instructions on this point. The judge repeated the instructions briefly, then asked if that satisfied the inquiry. One juror answered: “No sir. It doesn’t. Which ruling would take precedence?” Thereupon the judge read again the charge in its entirety.
The rules for invocation of the doctrine of last clear chance have been stated many times in our jurisprudence. It was well stated by us in Scott v. Glazer, 164 So.2d 185, 187 (1964), as follows:
“A litigant relying upon the doctrine of last clear chance has the burden of proving all facts and circumstances essential to its application. Pate v. State Farm Mutual Automobile Ins. Co., La. App., 147 So.2d 766; Phares v. Biggs, La.App., 135 So.2d 507; Fontenot v. Travelers Indemnity Company, La.App., 134 So.2d 330; Lawrence v. Core, La.App., 132 So.2d 82; Franicevich v. Lirette, 241 La. 466, 129 So.2d 740. Before the doctrine can be successfully invoked three essential facts must be established; (1) that the person invoking the doctrine was in a position of peril of which he was unaware or from which he was unable to extricate himself; (2) that the person against whom the doctrine is invoked actually discovered or was in a position where he could and should have discovered such other person’s peril; and (3) that at such time the person against whom the doctrine is invoked could have avoided the accident with the exercise of reasonable care. Sonnier v. Great American Insurance Company, La.App., 134 So.2d 363; Lavigne v. Southern Farm Bureau Casualty Ins. Co., La.App., 125 So.2d 430; Clark v. Shannon, La.App., 120 So.2d 307; Wells v. Meshell, La.App., 115 So.2d 648; Moore v. Shreveport Transit Company, La.App., 115 So.2d 218; Newton v. Pacido, La.App., 111 So.2d 895.”
See also Delgado v. Travelers Indemnity Company, 200 So.2d 89 (La.App. 1st Cir. *365 1967); Sales v. Guillory, 188 So.2d 429 (La.App. 3d Cir.1966); Russ v. Indiana Lumbermen’s Mutual Insurance Co., 170 So.2d 171 (La.App. 4th Cir.1964); Soileau v. New Hampshire Insurance Company, 160 So.2d 793 (La.App. 3d Cir.1964); Accardo v. Grain Dealers Mutual Insurance Co., supra.
Assuming arguendo that the boy was not aware of the approaching automobile when he ran into the position of peril, the plaintiff nevertheless has failed to discharge the burden of proof that Miss Bag-ert discovered or could have discovered the peril in time, with the exercise of reasonable care, to avoid the accident. The preponderance of evidence is that she was very near the rear of the waiting bus moving at 30 to 35 miles per hour when the peril of the boy was discovered. This did not give her sufficient time and distance to avoid the accident; and, therefore, since one of the necessary elements essential to the application of the doctrine of last clear chance has not been proven, plaintiff cannot invoke that doctrine.
Had Miss Bagert continued on a straight course when she first saw the boy it is likely she would have passed safely behind him since the evidence shows that he cleared the left traffic lane before the impact. She will not, however, be held to an accounting for not having taken the safer course when confronted with the sudden emergency not of her own making. It is a natural impulse for one in such a situation to instinctively turn away from the danger which suddenly appears in his path. This is what Miss Bagert did. She did not have sufficient time to consider if another course of action might have been a wiser choice. Herrin v. Southern Farm Bureau Casualty Ins. Co., 217 So.2d 696 (La.App. 3d Cir.1969) ; Waller v. King, 188 So.2d 231 (La.App. 2d Cir.1966); Burnett v. Marchand, supra. We think the jury fell into error through its failure to understand fully and apply correctly the principles of law charged by the court. Its verdict and the judgment of the court based thereon cannot be maintained.
We have no doubt that the minor plaintiff sustained serious injuries and a substantial award of damage would have been justified in a proper case, but it would, in our opinion, be a miscarriage of justice to allow the judgment to stand on the facts of this case and the law applicable thereto.
For these reasons the judgment appealed is reversed, and there is now judgment in favor of defendants-appellants rejecting plaintiff’s demands and dismissing his suit at his costs.
Reversed.