JAMES G. SCHILLIN, Judge ad hoc.
This demand results from an intersec-tional automobile accident, plaintiff alleging that on March 24, 1953 at about noon, while engaged in his regular employment of driving a New Orleans Public Service bus, his vehicle was struck by a huge tractor-trailer then being operated by Norman Seals, acting in the scope and course of his employment by Don W. Huey and Blytheville Canning Company.
The bus was being driven on Magazine Street away from Canal Street in an uptown direction, and plaintiff avers that when he had barely entered the intersection of Common Street (the first intersection from Canal Street to cross Magazine Street) he saw this large vehicle approaching from his left, whereupon he immediately applied his brakes and came to a complete stop; that while in this stopped position, the vehicle of defendants, travelling from the direction of the Mississippi River to the Lake, continued across Magazine Street without stopping, as a consequence of which “the right front portion of the trailer struck the right front side of the bus, * * * ” defendants’ trailer-truck continuing for a “considerable distance beyond Magazine Street before it was brought to a stop.”
After Don W. Huey and Liberty Mutual Insurance Company had been eliminated from the action, a circumstance which is not an issue here, defendants, Norman Seals, the driver of the tractor-trailer, and Blytheville Canning Company answered admitting that Seals was driving his vehicle on behalf of Blytheville Canning Company; that, as he was proceeding towards Lake Pontchartrain on Common Street, Seals slowed, and, seeing no traffic close enough to constitute a hazard, proceeded to cross Magazine Street, and, after having almost cleared the intersection, his vehicle was struck violently on the right side of the tractor unit near the rear end thereof by this Public Service bus operated by plaintiff; that, in the alternative, if primary negligence was established, then plaintiff was guilty of contributory negligence which bars his recovery.
While there are no traffic signs, signals or lights at the intersection of Magazine *584 and Common Streets, it is conceded that plaintiff’s vehicle had the right of way, and that he must succeed unless defendants have established their defense of “preemption.”
We adhere to the standards heretofore set forth in Vernaci v. Columbia Gas Co., La.App., 71 So.2d 417, 418, which a motorist must meet who relies on this doctrine, to-wit:
“Defendant’s plea that the truck preempted the intersection has no merit, ¡because pre-emption does not result from merely entering an intersection first. The motorist, before he can successfully rely on pre-emption, must show that he made entry into the intersection at proper speed and sufficiently in advance of the car on the intersecting road to permit him to proceed on his way without requiring an emergency stop by the other vehicle. The entry into the intersection just a fraction of a second ahead of the other vehicle does not create a pre-emption. Lafont v. Nola Cabs, Inc., La.App., 65 So.2d 918; Aucoin v. Houston Fire & Cas. Co., La.App., 44 So.2d 127; Butler v. O’Neal, La.App., 26 So.2d 753.”
It would serve no useful purpose here to sift or analyze the evidence. On the question of liability we agree with our learned brother below and adopt his findings and conclusions as our own, to-wit:
“The evidence convinces me that defendants’ truck driver was solely responsible for the accident, and that the bus driver was not guilty of primary or contributory negligence. Disinterested passengers in the bus testified that the truck driver crossed Magazine Street without stopping.
“There is no dispute between plaintiff’s and defendants’ witnesses that the truck of defendants did not stop before entering Magazine Street, but continued right on travelling 10 to 12 miles an hour. Defendants’ own truck driver and his brother, who accompanied him on the trip, so testified. The “truck driver testified he entered 8 to 10 miles an hour, while his brother testified 10 to 12 miles, but, for this purpose, we will assume he entered Magazine Street, without stopping, travelling 10 miles an hour. The truck driver also admitted he could see clear to Canal Street, a block away, or 150 feet. He saw the red traffic semaphore light at the intersection of Canal and Magazine.
“Plaintiff and his witnesses testified that plaintiff’s bus was travelling at a moderate speed of 15 to 18 miles an hour. There is no evidence as to the width of Magazine Street, which I must assume is 30 feet, or one-fifth the distance from Common to Canal. Plaintiff’s bus, therefore, had to travel 150 feet from Magazine and Canal, where the defendants’ driver first saw it, to the intersection where the collision took place, while defendants’ truck travelled across Magazine Street, a distance of 30 feet. Since defendants’ truck was travelling 10 miles an hour, plaintiff’s bus had to travel 50 miles an hour in order for the two to meet. Defendants’ truck driver did not preempt the intersection. He just entered it apparently without looking. The bus driver stated that, as he approached within 10 feet of the intersection of Common Street, he saw defendants’ truck approaching on Common Street, and concluded the truck could not, or would not stop. He applied his brakes, and the front part of his bus (the vestibule) came in contact with the right side of defendants’ truck.
“I am compelled to hold the accident was due solely to the failure of the defendants’ truck driver to accord plaintiff the right-of-way. Preemption of an intersection takes place when one *585 has the right to enter, not because he actually enters.”
We are particularly fortified in this resolution by the virtual admission by counsel for defendants, during the oral argument in this Court, that reliance is really placed on defendants’ alternative plea of contributory negligence, which plea must be overruled.
The substantial issue here is whether the quantum allowed by the Judge of $500 to plaintiff is correct, considering that plaintiff’s demand in the aggregate totals $45,150.46, because he contends his present, serious physical impairment was brought on, or aggravated by, this accident.
There is no contradiction of plaintiff’s testimony that, when the accident happened, he had one of his hands on the steering wheel, having applied the emergency brake with the other, as well as also applying the brakes; that after checking with his passengers, and having ascertained that none of them were seriously hurt, — “four or five of them went to the hospital for minor check-up and released at that time” — he got out of his bus and went over to talk to the driver of the other vehicle; that he made a report of the accident to New Orleans Public Service. When asked if he was “able to drive that bus away from the scene of the accident,” he replied: “I didn’t drive it away from the scene, no.” He went to the barn in an automobile with a supervisor and the latter sent mechanics down to take the bus in. He did not work the remainder of the day; he “did not feel good” after the accident, and after he had the breath knocked out of him he “did not feel good.” He admits he went back to work the next day, at which time he worked from 6:00 A.M. to 12:00 noon and from 4:00 P.M. to 6:30 P.M.; he worked continuously and regularly from the moment of the accident, on March 24, 1953, until April 14, 1953, eliminating the rest of the day, March 24, 1953, bearing in mind that the accident he alleges occurred about noon; that he was still suffering with pains off and on continuously every day until April 14th, when he had a hemorrhage.
On his own admission, except for pain which was neither discomforting nor disabling, no serious symptom appeared until April 14, 1953 when, while driving a bus, he commenced to vomit clear blood which in itself was an ominous predicament and complete evidence of a serious organic impairment.
The substantial question here is whether his then condition and what subsequently developed was proximately caused by defendants’ established negligence or whether the accident was a contributory factor thereto.
After a call from plaintiff’s wife he was rushed to a hospital, given eight pints of blood, and a small operation on his leg was performed, according to plaintiff, “in order to get blood to my body fast enough to save my life.”
After the accident plaintiff consulted Dr. James S. Webb, Jr., his family physician for ten or twelve years. When asked by counsel on direct examination if Dr. Webb was also the physician for the New Orleans Public Service, plaintiff stated that the doctor was the physician for the union to which plaintiff belonged; that the Union employs the doctor and the employees pay monthly union dues for that purpose.
Dr. G. Gordon McHardy, who specializes in gastroenterology (stomach and intestines) and who was a witness for plaintiff, made a thorough examination of plaintiff’s medical history prior to March 24, 1953, the date of the accident, as well as up to November 28, 1956, when he first examined plaintiff and which was, of course, more than three years after the accident. According to the hospital records, plaintiff had been admitted on March 23, 1950 for complaints referable to his urinary tract; that the record revealed only a diagnosis of epididymitis, — apparently says the witness, he had an infection of a part [1] *586 of his genital tract; that plaintiff was again hospitalized on July 16, 1950 and in the course of the examination he was found to have both liver and spleen enlargement; he was operated on for his genital-urinary condition, and the diagnosis then listed the genital-urinary condition. Thereafter, on November 30, 1950, plaintiff was readmitted for a genital-u'rinary condition and treated generally for that type of complaint. The hospital record further showed that his spleen was enlarged at that time and some abnormal studies related to his liver were made. The accident on March 24, 1953 then intervened and the next hospital record showed his admission on April 14, 1953, at which time he was found to be bleeding from the gastro-intestinal tract. In answer to the suggestion by counsel for plaintiff “that it has been generally admitted that plaintiff was found to be suffering with a throm-bocytopenia,” Dr. McHardy still testifying from the records, insisted that on April 14, 1953, when plaintiff was admitted as a consequence of the massive gastro-intestinal hemorrhage, no diagnostic studies were made that would have established the diagnosis of thrombocytopenia. On May 12, 1953 the witness insisted that no diagnosis of thrombocytopenia was shown from any of these records. Thrombocytopenia is a deficiency in the thrombocytes; a particular cell regurgitating in the blood stream.
Finally, the Doctor conceded a diagnostic study which began on September 17, 1953, pointed to a condition of thrombocytopenia on a single occasion, September 19, 1953, on the basis of which diagnosis a sple-nectomy was advised and performed. The spleen was examined in the pathological department with a final diagnosis of fibro-congestive splenomegaly, and that the study of the spleen was not compatible with the condition of a spleen anticipated in throm-bocytopenia purpura; that such a diagnosis was not well established.
The doctor testified that there has never been definitely established a diagnosis of an dicer of any kind in this case; that neither he nor the radiologist — both reviewing the X-rays — could find any evidence of ulcers; in addition the patient was gastroscoped, which involves looking into the stomach with an instrument whereby one can visualize the inside of the stomach; that there was no evidence of any ulcer within the stomach.
The doctor stated his conclusion to be that the studies, as made by the hospital records, made of plaintiff after his massive gastro-intestinal hemorrhage experience on April 14, 1953, do not indicate that a definite source for this hemorrhage had ever been established; that after a splenectomy —removal of the spleen — had been perform-[1] ed, the patient nevertheless had episodes of bleeding.
In the course of his examination of plaintiff on November 28, 1956, Dr. Mc-Hardy esophagus-scoped plaintiff by introducing into the esophagus an illuminated tube through which the examiner obtains direct vision of the lining of the esophagus; that this revealed large varices involving the distal half of the esophagus becoming progressively severe as the examiner approached the stomach; the mucosa lining of the esophagus was edematous (swollen), friable, which indicated that it broke very easily, inflamed and covered with an exudate; there was free regurgitation, that is, back flow of the material in the stomach into the esophagus; in addition, X-ray studies were performed on the same morning confirming the presence of varicosis in the esophagus with changes of co-existent esophagitis (inflammation of the esophagus).
The Doctor was led to a diagnosis of esophageal varices, esophagitis, incompetent esophago-gastro junction, which means substantially that the patient had large dilated veins throughout the esophagus, inflammatory changes of the mucosa or the fine lining over the veins — the veins in the esophagus; that the site of junction between the swallowing tube into the esophagus had become incompetent, permitting *587 the materials from the stomach to regurgitate into the esophagus, these findings being based on Dr. McHardy’s “impression of portal hypertension.”
After making a visual interpretation of the X-rays in open court, Dr. McHardy concluded that the bleeding intermittently suffered by plaintiff is the result of an esophageal varices, bleeding from large varicose veins in the esophagus. This was Dr. McHardy’s final opinion after his exhaustive study and analysis.
The doctor then conceded that possibly a thrombocytopenia was present when plaintiff’s spleen was removed but that there was no diagnosis confirmed of idiopathic throm-bocytopenia purpura. The doctor finally concluded that, prior to the accident on March 24, 1953, plaintiff suffered from esophageal varices resulting from portal hypertension; that he is suffering from this condition at the present time; and that the accident contributed to worsening this preexisting condition; that the condition is likely to become progressively worse; that, even if he had not had this traumatic episode, the normal history of the disease indicates that it would become progressively worse; that plaintiff was a sick man before the accident and is critically ill now.
On cross examination Dr. McHardy, while conceding that plaintiff had throm-bocytopenia, strongly dissented from the diagnosis shown by the hospital records of idiopathic thrombocytopenia purpura — that plaintiff merely “had a simple lowering of the platelet count.” In other words, giving full effect to the findings as shown on these hospital records, Dr. McHardy persisted in his refusal to agree that they warranted anything beyond a simple finding of throm-bocytopenia, stoutly refused to acknowledge that the diagnosis of idiopathic throm-bocytopenia purpura was warranted. Conceding that the presence of esophageal vari-ces did not necessarily mean that the patient would bleed from that area, and that while, unlikely, it is possible that a person may have such varices without experiencing gastro-intestinal hemorrhaging, the doctor asseverated that the X-ray finding dated May 15, 1953, showing no organic pathology in the esophagus, stomach, or duodenum, did not rule out the presence of esophageal varices on that date, May 15, 1953. The doctor insisted that “most esophageal varices are missed on X-ray examination,” that he did not miss them nor did another radiologist on reviewing those X-rays. When counsel for defendants placed great reliance upon a diagnosis of peptic ulcer the doctor noted that the discharging physician had placed a question mark against this diagnosis.
In denying that the effect of his testimony was that whatever hemorrhaging took place was the result of a rupture of the varices, the witness insisted that the patient bled from the mucosa (Mucous membrane) of the esophagus overlying the varicose vein; that while bleeding comes indirectly from the blood vessel, it does not necessitate the complete rupture of the varices; that in plaintiff’s case while the blood essentially came from the varices, it did so “without the complete rupture of the varices.” The witness later stated that the herniation of the mucosa, upon which he relies, was merely a possible explanation for the hemorrhage some three weeks after the accident; that he could not he certain. (Emphasis ours).
Dr. Charles C. Sprague, witness for defendants, subsequently said:
“Now it was postulated that possibly, either you said, I don’t recall, said the esophagus herniated down or herniated up. It should be the stomach herniating up, if the pressure works over to abdomen; we can anticipate that. Now if it did herniate up I would think that would probably slide back down. Now that type of anatomical change is usually congenital. It can be related to trauma, of course, but I would have thought if it did herniate up it would probably slip back down shortly thereafter; *588 but, again, it is speculative on either » side.” (Italics ours).
On both direct and cross-examination, Dr. McHardy explained away the absence of hemorrhaging sooner than three weeks after the accident because a person could bleed insidiously, gradually into the gastrointestinal tract without it becoming obvious unless he emitted blood or unless a patient was extremely meticulous in the examination of his bowel movement encountering a tarry-coal-black stool.
In giving his interpretation of the findings of the physicians as recorded on the hospital records, Dr. McHardy synopsiz-ed:
“In the first place, they indicated in most instances their lack of knowledge of the source of the bleeding, by putting a question mark on the diagnosis. The only time that they came out definitively was when they presumed the diagnosis of thrombocy-topenia primarily. The remainder of the time, on one occasion they put bleeding peptic ulcer. On the first occasion when they diagnosed bleeding peptic ulcer they had no x-ray, no data whatever to substantiate the diagnosis. On the second they put question of duodenal ulcer. They had two negative x-ray reports. On the third time that they put down bleeding peptic ulcer they had nothing except the evidence of bleeding on the last two admissions, that of 1955, they put down simple hematemesis, which isn’t a diagnosis, and in 1956 they put down hemorrhage, which is not a diagnosis. So it indicates, that these men were definitely uncertain; that would be the simplest way to state it.”
Dr. McHardy conceded that Dr. Silver-man, Dr. Webb, and other physicians at Baptist Hospital who observed plaintiff, saw him during his hospitalization and had made these tests, would be in a better position to offer a diagnosis than a witness seeing the patient once three and a half years after the accident, provided they had proven their diagnosis substantially by any finding recorded on the hospital records.
We interpolate here to observe that in view of this statement from plaintiff’s own experts, Dr. Webb and Dr. Silverman, and any other witnesses similarly situated, should have testified fully, particularly after the court below had reopened the case to hear Dr. McHardy.
The witness continues:
“Q. It is your opinion that the accident, as has been described to you, precipitated the first hemorrhage. Is that right? A. That is correct.
“Q. Now in view of the fact that these three weeks did elapse between the date of the accident and the first evidence of any hemorrhage, would you agree that there is a strong possibility that your opinion that there was a connection may be wrong? A. No.
“Q. Would you say unequivocally chat this accident caused this hemorrhage? A. No.
By The Court:
“Q. You say no? A. No.
“Q. In other words, you say it could have? A. Could have.
By Mr. Baus:
“Q. It could have; and it is possible that it could not have also?
By The Court:
“Q. Well, we know the doctor is only giving an opinion.
By Mr. Baus:
“All right.
“Q. Did you answer the question? A. I beg you pardon.
“Q. My question is it is possible? A. It is possible that the hemorrhage could have occurred without the acci *589 dent. Let’s say a hemorrhage could have occurred without the accident.
“Q. Without an accident? A. Yes.”
Dr. McHardy testified that possibly there was a thrombosis in the portal vein, and stated while not present at the time of the accident, it might possibly have been produced by the accident, which condition, while not necessarily causing the hemorrhaging, contributed to it. Dr. McHardy stated that the physician who operated at the time on plaintiff should have been able to locate, detect and remove this thrombosis. Conceding that there was no notation on the hospital record of a thrombosis found during the operation (in fact there was no notation at all with relation to the splenic vein), the witness admitted that this fact created a strong presumption that there was no thrombosis at the time of the operation.
The doctor noted that, while in his report he had mentioned the strong possibility of a cirrhosis of the liver, the accident of course had nothing to do with that. Considering that there has been filed in this court a motion to remand, which we shall consider later, setting forth that plaintiff did not have cirrhosis of the liver, the following from Dr. McHardy is significant and important:
“Q. Now the portal hypertension or the built-up pressure within the portal vein, couldn’t very likely have been the result of cirrhosis of the liver? A. We’re assuming that it was the result of cirrhosis of the liver.
“Q. You’re assuming that. Isn’t that right? A. Yes.”
Dr. George E. Welch, a specialist in internal medicine, also a witness for plaintiff, who was sitting in the courtroom during the testimony of Dr. McHardy, testified that he would substantially corroborate Dr. McHardy’s findings, and that plaintiff “must have portal hypertension”; that while plaintiff at one time had throm-bocytopenia — a low platelet' count — there was never “an established diagnosis of idiopathic thrombocytopenia purpura.”
As to whether the trauma caused the initial bleeding, Dr. Welch was in doubt, but nevertheless he thought in view of what the profession knows about bleeding from varices, esophageal varices, that it takes something to lower the resistance in the area where it takes place before the bleeding will take place. Finally, Dr. Welch refused to state that the trauma caused an aggravation of whatever preexisting condition plaintiff might have had; the doctor merely stated that it “could have.”
Dr. Welch asserted that a finding of •esophageal varices, based on an impression of portal hypertension, would have been better established had the hemorrhaging taken place sooner than three weeks after the accident, but was willing to say that this portal hypertension was possible nevertheless. Although Dr. McHardy had admitted that the hospital records, being silent on the presence of a thrombosis during plaintiff’s operation, created a presumption against such a diagnosis, Dr. Welch stated that the operating and attending physicians did not record a pressure in the portal system at the time; that having no idea what the pressure was, it might be very possible that they might have omitted looking for it — for a thrombosis.
It is obvious this is pure speculation, and can hardly create a tenable basis for a recovery under all of the circumstances of this case.
In a written report received in evidence by stipulation, Dr. George E. Burch, also for plaintiff, stated he refused to be certain that this accident aggravated plaintiff’s illness and suggested that Dr. James S. Webb, Jr., and Dr. D. N. Silverman, who saw the patient near the time of his accident, would be in a better position to’ make a more dogmatic statement of the cause-effect relationship of the accident to plaintiff’s illness and hemorrhaging. Notwith *590 standing the Trial Judge, in his original reasons for judgment, leaned strongly on Dr. Burch’s opinion in this respect, plaintiff was adamant and refused to produce either of these two physicians notwithstanding the court below had set aside its original judgment and re-opened the case in order to give plaintiff every opportunity to produce such additional medical testimony as was available to him.
This sole medical issue revolves around the predicate of the existence vel non of portal hypertension to the extent that a study of the hospital and other records warranted Dr. McHardy and Dr. Welch in reaching such an “impression.”
Dr. Charles C. Sprague, offered by defendants, unqualifiedly refutes the testimony that there was any evidence of portal hypertension, and without this prop the whole framework of plaintiff’s case disintegrates.[1] Dr. Sprague is an expert in the field of hematology (the sum of what is known regarding the blood) and he has always had a particular interest in throm-bocytopenia.
On the critical issue as to whether there is any causal relationship between the accident and the hemorrhaging. Dr. Sprague asserted that there was evidence to support a disease existing prior to the accident; the presence of the splenomegaly some three years after the accident makes it very likely that plaintiff had it at that time; and, furthermore, "he has had a course that could well be the natural course of that disease”; that, considering the type of trauma received by plaintiff, portal hypertension, if any, so far as this plaintiff is concerned, would have subsided within a short time.
Dr. Sam Nadler, specialist in internal medicine, produced by defendants, examined plaintiff on February 17, 1956, and after an illuminating discourse on the long history of plaintiff’s illnesses, opined that there was no causal relation between the accident and plaintiff’s subsequent condition.
Dr. Nadler testified:
“The point I made, if he had been bleeding since the day of trauma in March, he would have notice the tarry stool earlier (sic), than in the 24-hour period prior to admission; so that’s what led me to believe that his bleeding was of recent onset.”
It would serve no useful purpose to discuss further in detail the medical testimony offered on behalf of defendants. We have done so with plaintiff’s medical testimony in order to demonstrate that, considering the evidence in its most favorable light, plaintiff has failed to establish that this accident contributed in any way to his present unfortunate predicament. The Trial Judge elicited from Dr. McHardy that, without the intervention of trauma, the history of the disease — the disease found by Dr. McHardy — indicates that it would get progressively worse.
The failure of plaintiff to produce the testimony of Dr. Webb creates the presumption that if called and sworn as a witness the Doctor’s testimony would be adverse to the cause of plaintiff. Counsel, while not denying this rule of evidence, contends that he should be relieved of its application because the physician was “hostile.” The adjectives usually applied, in this connection, to a witness possessing such a characteristic is that he is unwilling to testify, reluctant, reticent, refractory, *591 deceptive, or evasive. It connotes “hostility,” “enmity.” Counsel for plaintiff stated, in response to a query from the Trial Judge, that this important available witness was “hostile” because he would give testimony injurious to plaintiff’s cause. Considering Dr. Webb was one of the first physicians to see and treat plaintiff after the accident, had performed the splenec-tomy, was plaintiff’s family physician, who ordinarily would testify as to the diagnosis, treatment and prognosis, he could hardly be a “hostile” witness in the sense being considered merely because he could not acquiesce in plaintiff’s contention as to the origin and cause of plaintiff’s illness in this case. Accordingly we are obliged to presume that the only reason for the failure to call this witness is that he would not corroborate plaintiff’s theory.
Nor was Dr. Silverman, to whom plaintiff was sent for consultation, produced as a witness.
Not to give the Court the benefit of the testimony of these physicians, especially that of Dr. Webb, becomes particularly significant considering the peculiar knowledge of plaintiff’s medical history, both before and after the accident, possessed by them.
Counsel for plaintiff has filed in this Court a motion to remand, setting forth that, since the judgment below on January 18, 19S7, plaintiff underwent an operation known as a porta-caval anasto-mosis to relieve the pressure in the portal vascular system; that further a liver biopsy was done, the pathological report of which shows no evidence of cirrhosis of the liver on microscopic study nor on gross appearance; that this evidence, which is newly discovered, will establish that plaintiff was suffering from portal hypertension at the time of the accident which was aggravated by the accident.
Plaintiff was injured on March 24, 1953 and this suit was filed on March 22, 1954. The trial below commenced on November 12, 1956; the original judgment was rendered on November 19, 1956; a new trial restricted to the medical testimony commenced on January 10, 1957, at which Dr. McHardy and Dr. Welch testified; final judgment was rendered on January 14, 1957. The Trial Judge, even after his first judgment, gave plaintiff full opportunity to establish his case, and counsel for plaintiff has been indefatigable in his efforts on behalf of plaintiff. In view of the history of this case, the ex parte showing on the motion to remand is not sufficiently persuasive to warrant re-opening the case on medical evidence of a pathological condition said to have been found on April 19, 1957, more than four years after the original trauma. The motion to remand must be denied.
The Trial Judge allowed plaintiff $500 for having been “shaken up a bit and suffering some shock and anguish,” to which defendants have made no substantial objection. 'Considering the admission at the bar of this Court that the judgment should have included the fees for plaintiff’s medical experts, we award $100 apiece for each of the two experts, Dr. McHardy and Dr. Welch, who testified on behalf of plaintiff, and in view of this modification, we are obliged to assess the costs of the appeal against defendants.
For the reasons assigned the judgment appealed from is amended by awarding to plaintiff an allowance of $200 for expert fees for Dr. G. Gordon McHardy and Dr. George E. Welch, and, as thus amended and in all other respects, the judgment is affirmed, defendants to pay the costs of this appeal.
Amended and affirmed.
JANVIER, J., absent

. Dr. Sprague (Tr. 79),:
“We have no evidence of portal hypertension here.”
(Tr. 83):
“This is speculation about the portal hypertension.”
(Tr. 92):
“Q. Doctor Sprague, you said you found no evidence of portal hypertension?
“A. No, sir, that’s correct.